Nathan **MILLER**, Plaintiff–Appellant,

v.

Emery **LEATHERS**, Officer,
Defendant–Appellee,

and

North Carolina Prisoner Legal Services, Inc.; Carolina Legal Assistance, Inc., Amici Curiae.

No. 88–7651.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1990.

Decided Sept. 13, 1990.

As Amended Oct. 12, 1990.

Steven H. Goldblatt, Director, Appellate Litigation Program, Georgetown University Law Center, Washington, D.C., argued (Dori K. Bernstein, Maureen F. Del Duca,

Supervising Attys., David L. Engelhardt, Student Counsel, Appellate Litigation Program, Georgetown University Law Center, Washington, D.C., on brief) for plaintiff-appellant.

Howard Edwin Hill, Associate Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., argued, (Lacy H. Thornburg, Attorney General, North Carolina Dept. of Justice, Raleigh, N.C., on brief), for defendant-appellee.

Roger Manus, Carolina Legal Assistance, Inc., Raleigh, N.C., Michael S. Hamden, North Carolina Prisoner Legal Services, Inc., Raleigh, N.C., for amici curiae.

Before ERVIN, Chief Judge, and RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, CHAPMAN, WILKINSON and WILKINS, Circuit Judges.

K.K. HALL, Circuit Judge:

Nathan Miller, a North Carolina inmate, brought this action pursuant to 42 U.S.C. § 1983 claiming that a state prison guard, Emery Leathers, used excessive force against him in violation of his Eighth Amendment rights. He appeals from the district court's order granting Leathers' motion for summary judgment. We vacate the judgment of the district court and remand the case for further proceedings.

### I.

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The facts and inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, and this party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Appellate review is *de novo* and, therefore, we are required to review the record under the same standards employed by the district court. *Fel-*

*ty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1127–28 (4th Cir.1987).

In order to succeed on his claim of excessive force, Miller must show that Leathers "inflicted unnecessary and wanton pain and suffering." *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1985). To determine whether the pain inflicted was unnecessary and wanton, a court should consider "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1084–85 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). " '[S]uch factors as the need for application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted' are relevant to that ultimate determination." *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085 (citation omitted). With these principles in mind, we turn to the facts.

### II.

On January 3, 1987, Miller filed a grievance with the prison administration complaining that Officer Leathers had told another inmate that he (Miller) was a "snitch." A correctional officer investigated the grievance by merely discussing it with Leathers, and the prison superintendent concluded that the "[i]nvestigation reveals that there is no merit to inmates [sic] complaint." Leathers brought a copy of the written decision to Miller's cell on January 7, 1987, to obtain his signature indicating that he had been served with it.

Upon reviewing the decision, Miller refused to sign it and a verbal confrontation ensued. Miller admits that he decided to verbally provoke Leathers in an attempt to get his grievances before higher authorities. He further alleges, however, that the threats and insults flowed both ways, and that at one point, Leathers threatened to "kick [Miller's] white ass." Miller eventually signed and returned the form, but

Leathers nevertheless decided to bring him out of his cell "to see the sergeant or lieutenant." Leathers then removed Miller from his cell, handcuffed him, and began to escort him down the hall.

According to Miller, the verbal sparring continued as Leathers escorted Miller off the cellblock and down a flight of stairs; this trip was punctuated by several jabs from Leathers' riot baton to Miller's back. Upon reaching a doorway which he claims was blocked by a food cart, Miller refused to move forward. Turning around to face Leathers, Miller claims that Leathers insulted him and that he responded in kind. At this point, Miller says that Leathers raised his baton and that he (Miller) raised his handcuffed hands to ward off the impending blow. After he was struck, he laughed at Leathers and was struck two more times. Miller also alleges that Leathers twice threatened to kill him during the incident. Miller claims that he reacted by pushing the officer away and picking up a broom handle to protect himself. With the aid of some nearby officers, Miller was eventually subdued. As a result of the blows from Leathers' baton, Miller sustained a fractured arm and a swollen elbow.

The district court, upon consideration of the materials submitted by both parties pursuant to Leathers' motion for summary judgment, concluded that there was a need for the application of force, the amount of force was not disproportionate to the need, the injuries inflicted were *de minimis*, and the force used was applied in a good faith effort to discipline Miller and was both reasonable and justified on the basis of the facts then known to Leathers. The district court concluded that Miller had no basis for recovery and, accordingly, dismissed the action against Leathers. This appeal followed.

### III.

On appeal, Miller contends that the evidence, when viewed most favorably

to him, clearly gives rise to an issue of fact as to the necessity for the amount of force employed by Leathers. He argues that his version of the events supports his claim that Leathers either intended to injure him once they were off the cellblock or, alternatively, that Leathers used excessive force not in response to a threat by Miller, but rather as a reaction to verbal provocation. We agree.

Miller's version of the incident supports a reasonable inference that Leathers intended to provoke an incident so as to allow Leathers to beat him under the guise of maintaining order or defending himself. The grievance filed by Miller indicates that Leathers may have harbored ill will against him.[*] Miller also points to a prison regulation that requires that the removal of a disruptive inmate from his cell may only be done in the presence of a sergeant or higher-ranking officer. Leathers' removal of Miller was apparently effected in violation of this regulation, and this undisputed fact further supports an inference that Leathers intended to retaliate against Miller.

The critical juncture in the sequence of events occurred at the doorway that Miller claimed was blocked. Unable to move forward as ordered, he was insulted by Leathers. Miller turned in the doorway and responded with a similarly provocative insult. It was at this point that Miller says Leathers raised his baton and he (Miller) reacted by raising his shackled hands to protect himself. The first blow brought a mocking insult from Miller, which in turn produced two more blows by Leathers.

Leathers characterizes Miller's actions in turning around in the doorway, while simultaneously directing a derogatory remark toward Leathers, as evincing "apparent offensive intentions." Leathers attempts to buttress his argument by pointing to Miller's history of violent behavior and by arguing that the blows inflicted were consistent with an attempt to defend

---

[*] It is impossible to minimize the possible consequences to a prisoner of being labelled a "snitch." *See Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir.1984) (§ 1983 claim by inmate, alleging that prison officials endangered him by labelling him a "snitch," allowed to proceed past service of process stage).

himself rather than to injure Miller. While his arguments may eventually prevail at a later stage of the proceedings, they are inadequate to overcome the genuine issues of material fact raised by Miller's statements.

■■■■ Accepting Miller's version as true, we find that it supports a "reliable inference of wantonness in the infliction of pain." *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir.1987). Verbal provocation alone does not justify a response such as occurred in this case, and whether there was any more than verbal provocation by Miller is in genuine issue on any fair reading of this record. Moreover, we are unable to agree with the district court's characterization of Miller's injuries as de minimis. The outcome of the case depends on the resolution of certain factual disputes which will largely turn on judgments about credibility. These determinations must be made by the finder of fact. Accordingly, we vacate the judgment of the district court and remand the case for further proceedings.

VACATED AND REMANDED.

WILKINSON, Circuit Judge, with whom Circuit Judges RUSSELL, WIDENER, and WILKINS join, dissenting:

Our nation's prisons, already racially charged, will become more so with this decision. The majority holds that an inmate can deliver racial taunts at a prison guard in an effort to provoke an altercation, and when the guard responds in a measured way, then sue him under § 1983. I am astounded that a § 1983 suit would lie for a prisoner who has engaged in a course of deliberate racial provocation, and I can only conclude that, despite the majority's invocation of *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), its standard has effectively been confined to its factual setting of institution-wide disturbances. On both of these grounds, and for the reasons expressed in the superseded panel opinion, *see* 885 F.2d 151, I dissent.

I.

The majority holds that "verbal provocation" on the part of a prisoner is legally irrelevant for purposes of summary judgment. I disagree. I believe that it is not only appropriate, but essential, that an inmate's deliberate racial provocation of his guard be taken into account when assessing whether the force employed by the guard " 'was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1084–85 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)).

It is undisputed that Miller baited Officer Leathers with degrading racial epithets. The majority fails even to mention that Miller, who is white, admits calling Leathers a "slush-headed nigger" and threatening him with physical violence. In addition, Miller leveled sexual insults against Leathers' mother. Miller even conceded in his own deposition testimony that he made a deliberate decision to provoke Leathers so that Leathers would write him up for a disciplinary infraction. Moreover, these taunts and threats were issued by a violent criminal who had many times over proven his willingness to back up his threats with action. Between March 1, 1978, and November 22, 1986, Miller had committed some twenty-seven disciplinary infractions, involving, among other things, possession of weapons, physical assaults, and threats of physical harm against numerous prison officials. In fact, it was because of Miller's past unruly conduct that he was in close custody and administrative segregation when Leathers left the grievance form with him and instructed him to sign it.

In the face of Miller's verbal assault accompanied by threats of physical violence, Leathers took no immediate action. It was only when Miller turned to face him—a move that would be difficult to interpret as anything but confrontational—that Leathers struck Miller with his baton three times about the arms and forced his retreat. Absent from the incident were the indicia of a retaliatory beating. Leathers

did not strike Miller in the head, groin, or from behind, nor while prostrate; instead, he struck him in the obvious area of the body with which Miller appeared to be attacking Leathers, his raised handcuffed arms and fists. While it is true Leathers struck Miller three times, the three blows were necessary because Miller caught and blocked the first blow between his handcuffs, and then laughed and taunted Leathers, telling him "his mama could hit harder than he was doing"—an indication that the first blow had not deterred Miller and that Miller sought to further provoke Leathers. It would be unrealistic to expect a more restrained response by Leathers to what can only be considered a threat of violence. *See Johnson,* 481 F.2d at 1033 ("The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force.").*

The majority now rules that Miller's stream of slurs and threats of violence were mere "verbal provocation" and all but immaterial for purposes of summary judgment. I do not think Miller's taunting conduct can be dismissed so lightly. The abusive language used by Miller was of the most contemptible sort—"fighting words" intended "by their very utterance [to] inflict injury or ... to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). While endurance of a certain amount of verbal jousting is part of the profile of professionalism of any prison guard, the people behind the uniforms are still human beings. Prisons, moreover, are combustible settings, and prison order rests upon a fragile equilibrium. *See Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). By discounting for purposes of summary judgment the significance of Miller's efforts to provoke a fight

with Leathers, the majority tips the balance against the maintenance of institutional order. It issues a regrettable invitation to racial conflagration by signaling prisoners that they may freely barrage their guards with slurs and threats of violence, and then, in a no-lose proposition, sue them under § 1983 if the guards respond in even so much as a measured way. Few rulings more seriously jeopardize the stability of the prison environment.

## II.

While professing to apply the "obduracy and wantonness" standard for cruel and unusual punishment in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the majority in fact limits the standard's applicability to the quelling of prison riots. Such a departure from the Eighth Amendment standard is warranted neither under the language of *Whitley* nor the concerns expressed in that decision.

The Supreme Court in *Whitley* stressed the difficulties of maintaining discipline in the prison setting, emphasizing that these difficulties are exacerbated when defiant and disobedient prisoners threaten institutional order. "[I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." *Id.* at 320, 106 S.Ct. at 1084; *see also Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Because prison officials often must immediately and emphatically defuse potentially explosive situations, courts should be "hesitan[t] to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second

---

* The majority makes much of the fact that Leathers may have acted in violation of a prison regulation by removing Miller from his cell outside the supervision of a higher authority to take him to see Leathers' superior. If such were the case, it would be a matter between Leathers and his supervisors, and would not be disposi-

tive of the present action. Indeed, if violations of internal prison regulations were conclusive of § 1983 liability, prison authorities might either be reluctant to promulgate strict rules of conduct for prison guards or be prone to cover up infractions.

chance." *Whitley*, 475 U.S. at 320, 106 S.Ct. at 1084.

In light of the dangers posed by defiant inmates and in recognition of the fact that unabated lawsuits against prison authorities are themselves no aid to prison discipline, the *Whitley* Court made the Eighth Amendment standard a difficult one to satisfy. For conduct to violate Eighth Amendment rights, it "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084. The infliction of pain is not cruel and unusual punishment "simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable." *Id.* "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id.*

There is nothing whatsoever in *Whitley* to suggest that this standard is not applicable to instances of individual insurgency or insubordination. *See Brown v. Smith*, 813 F.2d 1187 (11th Cir.1987). Indeed, one can readily imagine why the standard should apply. Defiance of prison rules may be contagious among inmates; testing the tolerances of guards may prove to be great sport. By reversing the grant of summary judgment here, the majority countenances conduct which hardly needs encouragement. It must do so, it explains, because "[t]he outcome of the case depends on the resolution of certain factual disputes which will largely turn on judgments about credibility." Maj. op. at 1089. While it is no doubt true that the quarrel between Miller and Leathers, like any other, had two sides, not every disputed fact between an inmate and a guard is a material fact for purposes of summary judgment. Rather, "a prisoner may avoid ... summary judgment ... only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain." *Brown*, 813 F.2d at 1188.

The *Whitley* Court indicated that obduracy and wantonness have not been demonstrated, and a § 1983 suit should not go forward, unless the prisoner who has allegedly been wronged can make "a showing that there was no plausible basis for the officials' belief that this degree of force was necessary." *Whitley*, 475 U.S. at 323, 106 S.Ct. at 1086. Here, Miller is incapable of making such a showing. In light of Miller's abusive language, his threats of violence, and his turning on Leathers in direct defiance of an order to move forward, it was not just plausible, but entirely reasonable, that Leathers believed the force he applied to be necessary to protect himself. To hold, as the majority does, that there is a genuine issue of disputed fact on this record is to "effectively collapse[ ] the distinction between mere negligence and wanton conduct ... implicit in the Eighth Amendment." *Id.* at 322, 106 S.Ct. at 1086. The result of the majority's holding is to leave the *Whitley* standard intact only in the context of prison riots, and to substitute a negligence standard in all other contexts.

Moreover, the majority compounds its error by relying on a statement of the standard for summary judgment which not only predates the Supreme Court's recent pronouncements on the subject, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), but also affords prison officials little legal protection against a spate of prison altercation suits. Quoting from *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979), the majority states that the nonmoving party "is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Maj. op. at 1087. The Supreme Court has recently made clear, however, that the burden on the responding party is considerably more exacting. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court stated that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted). Under this standard, it is even more plain that summary judgment was warranted because Miller failed to make the required showing that there was "no plausible basis" for Leathers to believe his use of force was necessary. *Whitley*, 475 U.S. at 323, 106 S.Ct. at 1086. The majority's view of summary judgment has transformed the inevitable two sides of every prison argument into a jury question under § 1983 and deprived prison officials of Rule 56's ordinary purposes.      ·

In addition to being in error as a matter of law, the majority's position is disastrous as a matter of prison policy. From this day forward, every altercation between prisoner and guard will provide the basis for a § 1983 suit which will invariably be allowed to go to the jury. Courts will become the new wardens whose job it now is to resolve the innumerable spats that may be expected to arise in any setting of confinement. Moreover, as a result of the majority's ruling, prison guards will be placed in an intolerable dilemma. If they fail to respond quickly and forcefully to a reasonably perceived threat of violence, they risk bodily injury to themselves and others; if they do respond, however, they will undoubtedly find themselves defending a § 1983 suit before a jury.

### III.

I recognize, of course, that the danger to institutional order is a double-edged sword in that the wanton use of force in violation of Eighth Amendment safeguards may itself be an impediment to institutional peace. Section 1983 is a vital protection against the malicious use of force by guards against prison inmates. The majority, however, transforms it from a protection into a license—a license for inmates to engage with impunity in calculated challenges to institutional authority.

I respectfully dissent.