4 F.3d 984
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Pansye S. ATKINSON, Plaintiff-Appellant,
v.
THE BOARD OF REGENTS, FROSTBURG STATE UNIVERSITY; Herb F.
Reinhard, Ph.D, President, Frostburg State University,
Officially and Individually; Frostburg State University,
Defendants-Appellees,
and
McGregor O'BRIEN; E. Joy Kroeger-Mappes; Geri Dino;
Carolyn Princes; Connie Groer; Steven Bevans;
Francis Tam, Defendants.
 No. 92-1969.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 1, 1993.
Decided: August 30, 1993.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. M. J. Garbis, District Judge.
 Frederick P. Charleston, Sr., Baltimore, Maryland, for Appellant.
 Richard Allan Weitzner, Assistant Attorney General, Baltimore, Maryland, for Appellees.
 J. Joseph Curran, Jr., Attorney General, Baltimore, Maryland, for Appellees.
 D.Md.
 AFFIRMED.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 This appeal is from the district court's grant of summary judgment in the plaintiff's Title VII and ADEA retaliation action. Finding that the plaintiff failed to meet her burden of establishing a prima facie case, specifically that she failed to establish any causal connection between her protected activity and any adverse actions taken against her, we affirm the grant of summary judgment by the district court.
 
 I.
 
 2
 Pansye Atkinson is a 63-year-old Black woman employed by Frostburg State University since 1969 when she was hired as the director of the University's newly-created minority student affairs program. The program was instituted at Frostburg in response to a legal settlement entered into by Maryland in 1970. The settlement specifically called for Frostburg to attain 12 percent Black enrollment by 1989. The Black enrollment at Frostburg currently stands at approximately 8.5 percent, below the 1970 goal but higher than the 2 percent Black population of the county where the University is located.
 
 
 3
 In her position as director of the Office of Minority Affairs, Atkinson reported directly to the president of the University. Herb F. Reinhard, Ph.D., was appointed President on July 1, 1986, having previously served for five years as an administrator at Florida A & M University, an historically Black university.
 
 
 4
 In the same year Reinhard became President, a steering committee of the University prepared a Self-Study Report for the Middle States Association of Colleges and Schools, an independent entity responsible for the accreditation status of the University. This report expressed strong concerns about the mission of the Office of Minority Affairs and specifically its historical role as advisor for all minority students who had not declared a major.
 
 
 5
 The Middle States Association of Colleges and Universities (MSACU) also made its decennial evaluation visit to Frostburg in 1986. After reviewing the Self-Study Report and conducting four days of on-campus interviews of students, professors, staff members, and administrators, the MSACU evaluation team concluded, inter alia, that the Office of Minority Affairs should no longer report directly to the President of the University, "who will be too busy to give the ongoing attention necessary," and that the role of the Office should be changed and expanded to provide support services not only to Black students but also to "all minorities, including women."
 
 
 6
 Shortly after his appointment in July 1986, Reinhard announced a reorganization of the University's administration which included the dismantling of the Office of Minority Affairs and the creation of two new offices, Affirmative Action/Equal Employment Opportunity (AA/EEO) and Student Human Relations, each with its own director. These directors would report to a Vice President instead of the President. As her old position was no longer operative, Atkinson was offered and accepted the directorship of the AA/EEO at her same salary and position grade. Bernard Wynder, a young Black man who had been Minority Student Admissions Recruiter, was appointed Director of the new Office of Student Human Relations.
 
 
 7
 Although Atkinson agreed to be the Director of the Office of AA/EEO, she believed that she had suffered a demotion as her responsibilities were reduced and she no longer reported directly to the President. Hence, on July 31, 1986, she filed a written complaint with the Allegany County Chapter of the NAACP alleging that she had been demoted by Reinhard and that his act constituted race discrimination. On the same day, Atkinson met with the president of the NAACP chapter, Harry Bunch, to discuss the complaint. Eventually, as a result of negotiations between the University and the NAACP chapter, the phrase Minority Student Affairs was appended to the end of the title "Office of Student Human Relations" and, beginning in January 1988, the AA/EEO Director, Atkinson, reported directly to the President.
 
 
 8
 In August 1986, Atkinson's office space was reduced from the three rooms and storage space allocated for the Office of Minority Affairs to one room and a storage room for the AA/EEO. In addition, some audio-visual equipment previously reserved for the now-defunct Office of Minority Affairs was distributed to another office.
 
 
 9
 In April 1987, the University conducted its Board-required biennial, campus-wide evaluation of all administrators. All faculty and staff were invited to evaluate all administrators on an evaluation form provided by the President. Participation was voluntary, anonymous, and confidential; the results were revealed only to the President and Vice-Presidents. After reviewing these evaluations, Reinhard advised Atkinson in writing that 79% of the 126 respondents rated her performance as ineffective.
 
 
 10
 In July of the same year, Atkinson received only a four percent cost of living increase, and no merit increase, in her pay. She also was moved to a smaller office on campus.
 
 
 11
 Early the following year (February 1988), Reinhard sent a memo indicating that Atkinson, as Director of AA/EEO, and another administrator did not need to attend President's Advisory Council meetings as it was not the best use of their time. In another organizational modification, Reinhard announced in a June 1988 memo that, in the interest of efficiency, the Executive Committee would consist only of the President, his two assistants, and the four Vice Presidents. Accordingly, the Director of AA/EEO would no longer sit on the Committee; instead AA/EEO concerns would be represented by the President since the Director reported to him. The Director, however, would continue to sit on the President's Cabinet.
 
 
 12
 In the same month that he announced the Executive Committee reformation, Reinhard notified Atkinson that she again would receive only a cost of living salary increase without a merit increase.
 
 
 13
 On September 8, 1988, Reinhard addressed an official letter of reprimand to Atkinson concerning her public expression of opposition, at a Faculty Senate meeting, to the President's proposed amendments to the University governance structure. She was reprimanded primarily for failing to voice any objections to the proposals at a prior meeting of the President's Cabinet and instead waiting to contest the proposals in a public forum.
 
 
 14
 As part of her job responsibilities, Atkinson was asked in June 1988 by Reinhard to revise the University's discrimination complaint procedures and to submit her proposal by July 25, 1988. She failed to provide a completed proposal by that time; but eventually, with considerable assistance from a number of faculty members, provided one. Another aspect of her job was cooperating with the University's AA/EEO Committee (made up of faculty) to achieve hiring and promotion goals. Several members of the Committee stated in affidavits submitted to the court that Atkinson was disorganized, unfocused, unprepared for meetings, and needlessly confrontational. Their dissatisfaction became so great that the Committee took the unprecedented step, after a secret ballot with only one dissent, of sending a letter to the Chair of the Faculty Senate (to whom the Committee reported) informing him that Atkinson was obstructing the Committee's good faith efforts.
 
 
 15
 In response to the Committee's concerns and Atkinson's difficulties in revising the discrimination report procedures, Reinhard sent a memo to Atkinson on November 4, 1988, outlining his worries and criticizing her performance. He further stated that continuance of certain conduct on Atkinson's part would offer him"no alternative except to seriously consider her continued employment at Frostburg State University."
 
 
 16
 Following receipt of this memo, Atkinson, on December 30, 1988, filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that she had been, from 1986 to present, "harassed and disciplined in retaliation for my having complained to the NAACP." She stated that she believed she also had been discriminated against on the basis of her age (58 at the time) and her gender.
 
 
 17
 After this, Atkinson again raised concerns of fellow faculty members by attending, with another Frostburg professor, a guest lecture in a closed class without seeking prior approval of the professor of the class. Both the Chair of the Faculty Concerns Committee and the Chair of the Faculty Senate wrote to Reinhard expressing their concerns that the sanctity of the classroom had been violated. In a March 6, 1989 memo, Reinhard passed those complaints on to Atkinson and the professor who attended the lecture with her. In this memo, Reinhard also reviewed the previous reprimands he had directed to her. He again indicated that if she continued in what he perceived to be recalcitrant behavior, he would have no alternative but to terminate her employment with the University.
 
 
 18
 Shortly thereafter, on June 9, Reinhard had reason to send another negative memorandum to Atkinson, as the results of the biennial performance evaluation again placed Atkinson last among all administrators, with 69% of the 111 respondents rating her as ineffective. That same month, Atkinson was notified that for the third year in a row she would not receive a merit pay increase, but only a cost of living adjustment.
 
 
 19
 For the fourth consecutive year, Atkinson did not receive a merit increase in pay in July 1990. In August 1990, Atkinson's office was moved once again. She now worked in an off-campus building where two other University offices also were located.
 
 
 20
 On August 30, 1989, Atkinson received a right to sue notice from the EEOC and filed her original complaint in the instant case on November 28, 1989. A first amended complaint was filed on December 7, 1990, and a second amended complaint-alleging discrimination on the basis of sex and age rather than race and age-was filed on August 9, 1990.
 
 
 21
 All claims against Reinhard were dismissed on November 13, 1990, for failure to effect timely service. When Frostburg made its motion for summary judgment, the only remaining claim against it was a retaliation claim brought under both Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e et seq.,and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 626(c). The claim is based on the above outlined actions taken by Frostburg and President Reinhard during the years 1986 through 1990.
 
 
 22
 After reviewing Frostburg's motion, the magistrate judge recommended that summary judgment be granted in favor of Frostburg. He made his recommendation after concluding that Atkinson failed to show a causal nexus between her protected activity (i.e., filing a complaint with the NAACP) and any adverse actions taken by the University. As an alternative basis for his decision, the magistrate judge also concluded that Atkinson failed to rebut the University's showing of a legitimate, non-discriminatory reason for all actions taken.
 
 
 23
 The district court adopted the magistrate judge's recommendation and entered judgment dismissing Atkinson's claims. This appeal followed.
 
 II.
 
 24
 Summary judgment is appropriate only when there is"no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). The court's function at the summary judgement stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). To that end,"[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." Id. at 255. The nonmovant "is entitled 'to have the credibility of his [or her] evidence as forecast assumed, his [or her] version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him [or her]." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)), cert. denied, 498 U.S. 1109 (1991). Although the evidence presented must be viewed in the light most favorable to the party opposing summary judgment, that party, nevertheless, must satisfy the burden of proof by offering more than a mere "scintilla" of evidence. The party opposing summary judgment must produce evidence sufficient for a reasonable jury to find in her favor. Anderson, 477 U.S. at 252.
 
 
 25
 In the context of Title VII or the ADEA, Atkinson, in order to establish a prima facie case, must show that 1) she engaged in protected activity, 2) the University took adverse employment actions against her, and 3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). If she fails to provide evidence supporting any one of these elements, then her claim cannot survive summary judgment.
 
 
 26
 With respect to the first element, Atkinson alleges that the University took retaliatory action against her after she filed her complaint with the Allegany County Chapter of the NAACP in July 1986. Both the magistrate judge and the district judge concluded that she satisfied the first prong of Ross. Moreover, both judges assumed that some negative employment actions were taken against Atkinson. Both, however, also concluded that Atkinson failed to forecast even a scintilla of evidence that her protected activity provoked the criticism and refusal of merit pay increase by Reinhard. We agree.
 
 
 27
 Atkinson's claim of a causal link is simply that"the University's President was aware of her complaint and took actions against her after learning about the complaint." She claims that she has demonstrated a genuine factual dispute because she can point to "at least nineteen (19) acts of harassment and retaliation committed by the University against Appellant." Nevertheless, the evidence of the negative employment actions themselves does not also serve as evidence of causation. If such was the case, then the third requirement for establishing a prima facie case would be superfluous, as it would be subsumed by the second.
 
 
 28
 Hence, Atkinson's argument that the magistrate judge erred in not resolving all conflicting inferences in favor of the nonmovant fails, because, as the district court pointed out, "there is no evidence from which it can be inferred that adverse employment actions were caused by protected action."
 
 
 29
 Insofar as Atkinson fails to produce any evidence connecting the two events, protected activity and negative employment action, except for temporal proximity, she fails to demonstrate a genuine issue of a material fact. Her argument that the issue of causal connection is one of intent and thus appropriately left for the factfinder is unconvincing. Because she has failed to produce evidence placing Reinhard's or the University's intent into question, she has not provided a factfinder with any basis for making a determination in her favor. To conclude otherwise would be to allow unsupported allegations regarding motive to create immunity from summary judgment. We have refused before to adopt such a position. Ross, 759 F.2d at 365.
 
 
 30
 As the magistrate judge commented in his recommendation:
 
 
 31
 Taking the facts presented in the light most favorable to Atkinson, it appears that there was a significant incompatibility in working styles between Reinhard and Atkinson. The only logical conclusion to draw is that this incompatibility resulted in a very contentious working relationship, communications difficulties and disappointed expectations on both sides. This is certainly unfortunate, but it does not rise to the level of a federal claim for discriminatory retaliation.
 
 
 32
 Magistrate Judge's Report and Recommendation [footnote omitted].
 
 
 33
 The decision of the district court is therefore
 
 
 34
 AFFIRMED.