John P. McCORMICK, Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC, et al., Defendants.

No. CIV.A.02–907–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 31, 2003.

William H. Bode, Bode & Grenier LLP, Washington, DC, for John P. McCormick, plaintiff.

Heather French, Christine A. Samsel, Akin, Gump, Strauss, Hauer & Feld, LLP, for Level 3 Communications, Inc., Level 3 Communications, L.L.C., J. Neil Hobbs, defendants.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court is defendant's Motion for Summary Judgment.[1] On March 7, 2003, we heard oral argument on the motion and granted summary judgment in favor of defendant Level 3 Communications, LLC ("Level 3") on Counts II (Actual Fraud), III (Constructive Fraud) and IV (claim under the Colorado Wage Claim Act) of plaintiff's complaint. We deferred ruling on Count I (Breach of Contract) because the parties requested additional time to attempt to settle this civil action. On March 14, 2003, the parties notified the Court that a settlement could not be reached and requested that the Court rule on the remainder of the motion. For the reasons set forth below, defendant's Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff John McCormick began working as a sales representative for defendant Level 3 at its office in McLean, Virginia in February 1999. His employment was terminated on December 5, 2001. Plaintiff received commissions based on his sales in addition to his base salary. In February 2001, Level 3 announced a new 2001 Global Revenue–Based Commission Plan ("the Plan"), which plaintiff signed on August 17, 2001. In his complaint, plaintiff alleges that Level 3 breached its obligations under the Plan, which we consider to be the contract in this case, by failing to pay him adequate commissions on four sales contracts between Level 3 and XO Communications, Inc. ("XO"), which the parties refer to as: (1) the Dark Fiber Deal, (2) the Transoceanic Deal, (3) the Waves Deal, and (4) the Managed Modem Deal.

The Plan provides for two types of commissions: Revenue–Based Commissions

1. Defendants Level 3 Communications, LLC and Level 3 Communications, Inc. filed their Motion for Summary Judgment on February 10, 2003. On March 4, 2003, plaintiff and defendants filed a stipulation of dismissal without prejudice of defendant Level 3 Communications, Inc. Therefore, Level 3 Communications, LLC is the only remaining defendant seeking summary judgment.

and Indefeasible Right of Use ("IRU") Based Commissions. Under the Plan, Revenue–Based Commissions, which are earned on non-IRU products and services, are to be based upon the participant's generation of Net Billed Revenue ("NBR"). The Plan provides that NBR "is counted when billed for the purposes of this component of the Plan," and the commission "is based on monthly Net Billed Revenue from your total portfolio of accounts." Plan at 3. IRU–Based Commissions are earned on IRU Sales of three specific types of products and services: Dark Fiber IRUs, Wavelength IRUs, and Transoceanic IRUs.[2] For all IRU deals, a participant's commissions are to be based on the eligible contract value of a deal which he sold and for which Level 3 received payment. Plan at 6, 9–10.

Although there was no overall cap on sales commissions, the Plan includes a provision entitled "Windfall on Projects and Special Accounts," which states:

> The Company reserves the right to limit the amount of Commissions paid on any revenue that could result in a windfall payment and to determine what would result in a windfall Commission payment. The Company, on an individual case basis, will determine compensation for break-even or net-loss sales and its decision shall be final.

Plan at 15.

In 1998, before plaintiff joined Level 3, Level 3 negotiated a Dark Fiber Deal with XO, in which it agreed to provide XO with fiber optic lines for voice and data transmission. XO experienced business problems, which had an impact on its contracts with Level 3. In April 2001, Level 3 negotiated a "Workout Agreement" with XO in which Level 3 forgave XO's performance on certain contracts in exchange for XO honoring the outstanding Dark Fiber Deal and agreeing to purchase other services, including a Wavelength Deal (called the "Waves Deal") and an acceleration of the previously negotiated Transoceanic Deal. There is no evidence in the record that plaintiff was involved in negotiating the Workout Agreement, and plaintiff does not argue that he was involved. In February 2001, plaintiff was designated the sales representative for the XO account.

Although Level 3 has not explained why it did so, it paid plaintiff approximately $96,000.00 in commissions on the Dark Fiber Deal in the first two quarters of 2001. It also paid plaintiff $15,000.00 in commissions on an upgrade portion of the Transoceanic Deal, providing upgraded data connection between New York and London, although there is no evidence that plaintiff was involved in negotiating that part of the Workout Agreement. The Waves Deal, in which XO agreed to purchase wavelength connections in North America, was also negotiated as part of the XO Workout Agreement. Under the Workout Agreement, Level 3 provided XO a wavelength network in exchange for transfer of certain equipment from XO. Plaintiff never received any commissions from this deal. In late 2001, plaintiff negotiated a Managed Modem Deal with XO under which XO agreed to purchase services to be invoiced and paid monthly. The deal was finalized on October 21, 2001. Plaintiff never received any commissions on the Managed Modem Deal.

On October 12, 2001, Carmella Surdyk, Level 3 Global Vice President of Sales Operations, sent an email to other Level 3 executives regarding plaintiff's commis-

---

**2.** The Plan also provides that IRU–Based Commissions are available on Long Term Capital Lease ("LTCL") products and services. Plan at 6. However, we understand from the pleadings submitted that no LTCL deals are at issue in this case.

sions on the XO account. Surdyk wrote as follows:

> Given JP [McCormick] was not directly responsible for the initial sale to XO Communications and has been heavily involved with the implementation and ordering of the services to support the contract, Neil [Hobbs] has approved payment of $5,000 per month for 5 months to compensate JP for his efforts in this account. JP has been paid $96,671.34 in Dark Fiber commissions and approximately $15,000 in Wavelength commissions this year providing him with total payments of approximately $111,671.34 plus an additional $25,000 providing a total commission payment opportunity of approximately $136,671.31. JP must be an active employee of record on date of disbursement in order to be eligible to receive the aforementioned payment of $5,000 per month for 5 months.

Exhibit J to Plaintiff's Opp. to Defendant's Motion for Summary Judgment. Plaintiff had received three of the $5,000.00 payments when he was terminated on December 5, 2001.

In 2001, Level 3 instituted its Moneyraker Contest, designed to reward top monthly and quarterly sales representatives with cash prizes. The contest rules provided that, to be eligible for the monthly prize of $7,500.00, a participant must make $50,000.00 in net sales, have $50,000.00 in NBR, and be one of the top three sales representatives for the month. Exhibit 2 to Decl. of Carmella Surdyk at LLC009660. In his complaint, plaintiff claimed that he was entitled to the monthly bonuses for August, September and October, and the quarterly bonus for the third quarter, for a total of $47,500.00.

---

**3.** In his deposition, plaintiff testified that the Dark Fiber orders "had already been written" when he was assigned the account, but he did not know who wrote them. Dep. of Plaintiff, Jan. 10, 2003, at 97.

## DISCUSSION

A court may grant summary judgment "only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990) (citing Fed.R.Civ.P. 56(c)). In ruling on such motions, the court must construe the facts and all inferences drawn from those facts in favor of the non-moving party. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Having performed this analysis, the Court finds that summary judgment should be entered in favor of the defendant as to all of plaintiff's claims under the Plan, but that there exists a genuine dispute regarding plaintiff's entitlement to one prize under the Moneyraker Contest.

### A. Dark Fiber Deal

■ Although plaintiff has already received $96,000.00 in commissions on the Dark Fiber Deal and seeks an additional $69,534.98, we find that, under the terms of the Plan, he was not entitled to any commissions on that deal. The Plan clearly provides that Dark Fiber commissions be based on the eligible contract value of Dark Fiber Deals *"which you have sold* and for which the Company has received payment." Plan at 6 (emphasis added). Although plaintiff concedes that he did not sell the Dark Fiber Deal,[3] he argues in his Opposition that he "remained entitled to one-half commissions on all the Dark Fiber deals he had inherited" and that he "was entitled to commissions on Dark Fiber even if he did not make the sale." Opposition at 7, 23. Plaintiff does not explain why he believes he is entitled to these

commissions and cites only the Plan, generally, to support these statements. From our reading of the Plan, we can find no provisions that support his argument that he was entitled to commissions on contracts he did not sell.

Even if plaintiff were entitled to a commission on the Dark Fiber Deal, according to the deposition testimony of David M. Windfeldt, Manager of Finance at Level 3, "dark fiber commissions...were earned when the segments were accepted by the customers." Windfeldt Dep., Feb. 25, 2003, at 52 (cited in Plaintiff's Supp. Memo. in Opp. at 2). Plaintiff has presented no evidence of any Dark Fiber segments accepted by XO during his employment with Level 3.[4] Therefore, plaintiff has not shown he was entitled to any Dark Fiber commissions on the basis of product acceptance.

Lastly, defendant argues that even if plaintiff were entitled to commissions on the Dark Fiber Deal, it properly invoked the Windfall Provision to limit any commissions plaintiff may have been eligible to receive on the XO account. Plaintiff counters that there is a genuine dispute about the meaning of the Windfall Provision and whether it was properly applied to plaintiff's XO commissions. Plaintiff argues that because the Windfall Provision is titled "Windfall on Projects and Special Accounts" it could only be applied to "projects" and "special accounts." These terms are not defined in the Plan but plaintiff argues that they were understood to mean break-even or net-loss sales. Opp. at 6. He tries to support this argument with the deposition testimony of Mitchell Moore, plaintiff's supervisor, and Carmella Surdyk. However, Moore testified that an exchange of assets deal was an example of a project and that the special

accounts he was familiar with were "intercompany accounts." Moore Dep., Jan. 21, 2003, at 56–67. Surdyk testified that "[a] special account would have been any customer or set of accounts of a customer that would have resulted in significant earnings potential for the rep." Surdyk Dep., Jan 28, 2003, at 106. Neither of these statements supports plaintiff's interpretation of the Windfall Provision. The plain language of the provision does not limit its application to break-even or net-loss sales, but states that Level 3 "reserves the right to limit the amount of Commission paid on *any* revenue that could result in a windfall payment." Plan at 15 (emphasis added).

The Windfall Provision, which we find defendant could properly apply to plaintiff's XO commissions, grants Level 3 absolute discretion to determine what accounts would result in a windfall. The email by Carmella Surdyk regarding plaintiff's XO commissions shows that Level 3 exercised that discretion in good faith, limiting plaintiff's commissions because he did not sell any of the XO contracts. Therefore, even if Level 3 were obligated to pay plaintiff commissions on the Dark Fiber Deal, the Plan permitted them to limit those commissions. On these uncontradicted facts, we find defendant had no contractual obligation to pay plaintiff any commissions on the Dark Fiber deals, and, therefore, defendant did not breach its contract with the plaintiff when it failed to pay him the additional $69,534.98 he seeks.

### B. Transoceanic Deal

█ Plaintiff received $15,000.00 in commissions on the Transoceanic deal in 2001, and seeks an additional $516,844.28 in commissions for this deal. However, for the reasons stated above, we find that he is

---

**4.** At oral argument of defendant's Motion, plaintiff's counsel conceded that no evidence of acceptance by XO had been submitted to the Court.

not entitled to any commissions on this deal. Like Dark Fiber commissions, Transoceanic commissions are calculated "based on the eligible Contract Value of Transoceanic IRU deals *which you have sold* and for which the Company has received payment." Plan at 10 (emphasis added).

Plaintiff does not allege that he sold the original Transoceanic deal to XO or that he participated in negotiating the Workout Agreement that accelerated performance of the Transoceanic upgrade.[5] The undisputed evidence presented by the defendant shows that the plaintiff was not entitled to commissions on this deal because he did not sell the contract. Carmella Surdyk testified in her deposition that plaintiff had not sold the Transoceanic Deal, that the original seller had been paid commissions on that deal, and that, therefore, plaintiff should not have been paid any commission on this deal. Surdyk Dep., Jan. 28, 2003, at 52–53. David M. Windfeldt testified that the Transoceanic Deal was sold by a European Sales Representative named Paul Carpenter. Windfeldt Dep., Feb. 25, 2003, at 30. Windfeldt also testified that, because this deal was not sold by the plaintiff, plaintiff was not entitled to receive commissions for sales made pursuant to that deal. *Id.* at 31. Moreover, plaintiff has presented no evidence that revenue was received by Level 3 on this deal. Therefore, under the terms of the Plan, plaintiff is not entitled to receive commissions on the Transoceanic deal, and the defendant is entitled to summary judgment on this portion of plaintiff's breach of contract claim. As discussed above, even if the Plan obligated Level 3 to pay plaintiff commissions on the Transoceanic Deal, Level 3 properly invoked the Windfall Provision to limit those commissions.

## C. Waves Deal

█ Unlike the other XO deals at issue in this case, the Waves Deal was an equipment transfer deal in which XO did not pay Level 3 cash for wavelength services, but transferred equipment to Level 3 instead. Plaintiff claims he is entitled to $1,269,882.00 in commissions on the Waves Deal.

The Plan provides that Wavelength commissions are "based on the eligible Contract Value of. . . deals *which you have sold and for which the Company has received payment.*" Plan at 9 (emphasis added).[6] Defendant argues that, even if the equipment transferred to Level 3 could be considered commissionable revenue under the Plan, it is undisputed that the equipment was not transferred until after plaintiff was terminated. *See* Mortensen Dep., Jan. 29, 2003, at 25. Because, under the Plan, plaintiff had to be employed through the end of the month in which the revenue was received in order to be eligible for commissions, *see* Plan at 18, he is not entitled to any Wavelength commissions.

Plaintiff does not dispute that the equipment was not transferred until after his termination. Instead, he makes two conflicting arguments. First, in his Opposition, plaintiff argues that he was eligible to receive commissions in April of 2001 when

---

5. Q: Do you know who negotiated the [Transoceanic] deal initially with XO on behalf of Level 3?

[PLAINTIFF]: I believe that was the—it was done through the work-out agreement, which was—Dan Caruso which—who was the executive on the account.

Dep. of Plaintiff, Jan. 10, 2003, at 162–63.

6. Although defendant does not argue that plaintiff is ineligible for Wavelength commissions because he did not sell this contract, we observe, again, that plaintiff has presented no evidence that he participated in the sale of this deal or the negotiation of the Workout Agreement of which this deal is a part. *See* Dep. of Plaintiff, Jan. 10, 2003, at 155.

defendant "recognized" this revenue for accounting purposes. Plaintiff cannot point to any provision in the Plan or any other evidence which supports his theory that revenue recognition is a commissionable event under the Plan.[7] The Plan specifically states that commissions are payed when "the Company has *received payment.*" Plan at 9 (emphasis added). In his Supplemental Memorandum in Opposition, plaintiff recasts his argument to claim that Level 3 received "payment" on this deal in April of 2001 when it "credited" this amount to XO. Supp. Memo. in Opp. at 5. This argument fails because plaintiff does not explain how the Plan can be interpreted to authorize commissions based on a credit for equipment transfer and provides no evidence in support of his argument.

The plain language of the Plan provides that commissions are payable only after Level 3 has received payment. Even if the equipment contemplated by the Wave Deal could be considered "payment" upon which a commission could be based, it is undisputed that this payment was not received while plaintiff was employed by Level 3. Therefore, plaintiff is not entitled to any commissions on the Waves Deal.

### D. Managed Modem Deal

■ Plaintiff seeks $450,000.00 in commissions on the Managed Modem Deal. This figure represents 1% of the total anticipated contract value. *See* Dep. of Plaintiff, Jan. 10, 2003, at 102. Unlike the

other XO deals, which were negotiated by other Level 3 employees, plaintiff did negotiate this deal. However, in his deposition, plaintiff conceded that the Managed Modem Deal he negotiated with XO was subject to the Plan's Revenue–Based Commissions provision.[8] The Plan provides that these commissions are "based on the monthly Net Billed Revenue from your total portfolio of accounts." Plan at 3. The Plan also provides that "[r]evenue is counted when billed" for purposes of Revenue–Based Commissions. *Id.* Therefore, plaintiff is entitled to commissions, not on the total contract value, but only on the amount billed to XO on this deal through the end of November of 2001, the last full month of plaintiff's employment.[9] Defendant claims that no revenue was billed to XO under this Managed Modem Deal before plaintiff's termination and that, therefore, plaintiff is not entitled to any commissions on this deal. Plaintiff does not dispute this statement in his pleadings and has provided no evidence that XO was billed for managed modem services before December 2001. Therefore, we find that plaintiff is not entitled to any commissions on the Managed Modem Deal and that defendant did not breach its contract in failing to pay plaintiff such commissions.

### E. Moneyraker Contest Prizes

■ Although in his complaint plaintiff claims he is entitled to the monthly Moneyraker prizes for August, September, and October of 2001 and the quarterly prize for the same period, in his Opposition he does

---

**7.** In fact, David Windfeldt testified that Level 3's recognition of revenue based upon equipment received "would have no correlation with the amount of commissions that [he] would calculate on that, because it is not based upon recognized revenue." Windfeldt Dep., Feb. 25, 2003, at 130.

**8.** Plaintiff stated that the Managed Modem deal "would be classified in the—on your net

billed revenue base commission rate." Dep. of Plaintiff, January 10, 2003, at 103.

**9.** Although plaintiff was employed until December 5, 2001, Level 3 was obligated to pay commissions generated by the plaintiff through the last full calendar month of employment. Plan at 18.

not dispute defendant's assertion that he was ineligible for the monthly prizes in August and September and that another Level 3 employee with higher net sales and revenue won the quarterly prize. The only remaining dispute appears to be over the October monthly prize. Defendant claims that, although plaintiff was eligible for the October prize and was within the top three salespersons, he could not receive the prize because it was calculated and disbursed after his termination. Plaintiff argues this is a bad faith attempt by defendant to avoid paying him, and that in previous months the prize was calculated in the month immediately following the award month.

The contest rules provide that the earnings from this contest "will be paid via Commission check one month in arrears." Exhibit 2 to Decl. of Carmella Surdyk at LLC009660.[10] However, Carmella Surdyk states in her declaration that it regularly took over a month for the monthly net sales and net revenue to be calculated. This statement is not sufficient to explain why plaintiff would not have been eligible for the prize under the contest rules. We find a genuine issue about whether plaintiff is due the $7,500.00 prize for October, and therefore, defendant is not entitled to summary judgment on this portion of plaintiff's claim.

For the reasons stated above, defendant's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. Specifically, we find that plaintiff is not entitled to further commissions on any of the XO accounts and can recover no more than $7,500.00 for the Moneyraker Contest. An appropriate Order shall issue.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, defendant's Motion for Summary Judgment is GRANTED as to all of plaintiff's breach of contract claims in Count I except for the claim that defendant breached its compensation agreement by failing to pay plaintiff the Moneyraker Contest prize for October 2001. Only this issue will go to trial.

The Clerk is directed to forward copies of this Order to counsel of record.

---

**10.** Plaintiff's claim that he is entitled to the Moneyraker prizes rests entirely on his assertion that these contest rules constitute a contract. Defendant has not argued otherwise and we will not look beyond defendant's arguments. We note, however, that these rules, which are unsigned, provide that "Management reserves the right to modify the Contest Rules at any time—with or without prior notification." Exhibit 3 to Decl. of Carmella Surdyk at LLC009660.