David A. **KIRK**, Appellant,

v.

**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY,**
Appellee.

No. 90–2322.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 4, 1991.

Decided Aug. 19, 1991.

Donald J. Adams, Harrison, Ark., argued (Michael E. Kelly, Yellville, Ark., on brief), for appellant.

Byron Freeland, Little Rock, Ark., for appellee.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge and FAGG, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

David A. Kirk appeals from the district court's [1] determination that he is not enti-

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

tled to recover benefits under the terms of his health care plan in this action filed pursuant to 29 U.S.C. § 1132(a)(1)(B) (1988). We affirm.

On May 1, 1988, Kirk became a covered participant in a health care benefits plan for employees of Tyson Foods, Inc., which was set up under the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 (1988) (ERISA), and administered by appellee Provident Life and Accident Insurance Company. In July 1988, Kirk was diagnosed as suffering from bacterial endocarditis and underwent surgery to replace his aortic valve. Provident denied his resulting claim for medical benefits under an exclusion in the policy which provided that "[n]o benefits [were] payable for expenses due to any Injury or Illness beginning before the effective date of the coverage." App. 45. Provident found that although Kirk's problem was not diagnosed until after he became covered under the policy, the medical records indicated that the endocarditis was a pre-existing condition, that is, it began prior to the effective date of coverage. Kirk filed suit in the Circuit Court of Marion County, Arkansas, and Provident removed the case to federal district court.

The district court reviewed the denial of benefits de novo in accordance with *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–957, 103 L.Ed.2d 80 (1989). *Accord Harper v. R.H. Macy & Co.*, 920 F.2d 544, 545 (8th Cir. 1990). Although the case was governed by federal law, the parties agreed that in interpreting the terms of the policy the district court could adopt by analogy, the standard for determining whether a condition is pre-existing under Arkansas law,[2] as set forth in *State Nat'l Life Ins. Co. v. Stamper*, 228 Ark. 1128, 312 S.W.2d 441 (1958), as follows:

the weight of authority is that the sickness should be deemed to have had its inception at the time it first manifested itself or became active, or when suffi-

cient symptoms existed to allow a reasonably accurate diagnosis of the case, so that recovery can be had, even though the disease, germs or infection was [sic] present in the body prior to the excluded time, if the condition was latent, inactive, and perhaps not discovered.

*Id.* at 1129, 312 S.W.2d at 442.

The district court, agreeing with Provident, found that although the endocarditis was not diagnosed until after the effective date of the policy, the infection began prior to the effective date. The district court concluded that under the terms of the policy, the relevant inquiry was when the illness began, not the point of diagnosis. Thus, the exclusion was properly invoked and Kirk was not entitled to payment under the policy.

Like the district court, we must review the denial of benefits de novo. *Harper*, 920 F.2d at 545. The record on appeal includes Kirk's medical records as well as the deposition testimony of Kirk's various treating and consulting physicians. The record shows that Kirk was examined by Dr. Henry Kirby on March 1 and 2, 1988, at which time he complained of a constant pain in his right flank, night sweats, and an ache in his right leg. Dr. Kirby noted that Kirk had a heart murmur, which was probably congenital. In addition, Kirk's white blood count and temperature were elevated, indicating the presence of an infection. Dr. Kirby prescribed antibiotics and Kirk's symptoms were temporarily alleviated. On March 20, Kirk developed a pain in the elbow and his temperature became elevated. When Dr. Kirby examined Kirk on March 22, he noted a redness, swelling and tenderness of the medical cubital vein and again prescribed antibiotics. Kirk was examined by Dr. Kirby once more on March 23, by which time Kirk had developed a lesion on his left knee. At that time, Dr. Kirby suspected that Kirk's symptoms might have been caused by congenital heart disease, which can cause a bacterial vegetation or growth in the lining of the

**2.** In reviewing the terms of an ERISA plan, state law can be used as a guide as long as it is not contrary to the provisions of ERISA. *Brewer v.*

*Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153 (8th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991).

heart. A blood culture, however, did not produce a bacterial growth.

Kirk was relatively symptom-free during April and May. In June he had problems with swelling in his hand and knee, headaches, and an elevated temperature. He was admitted to the hospital on July 15, 1988, and an echocardiogram was done, which showed a vegetation on his aortic valve. Kirk's doctor at that time, Dr. Tom Leslie, referred Kirk to a heart specialist, Dr. Brian Barlow. Dr. Barlow identified Kirk's illness as bacterial endocarditis, an infection of the heart valve, and referred Kirk to Dr. Doyne Williams, who conducted the surgery on July 22, 1988. In Dr. Barlow's opinion, Kirk's medical history indicated that the infection had probably been present for about three months prior to surgery. Dr. Barlow explained that with endocarditis, blood cultures often grow bacteria if the patient has not been treated with antibiotics; antibiotic treatment suppresses the growth so that the bacteria, although present, will not grow in a culture. Thus, while there was no objective data to confirm a diagnosis of endocarditis until the echocardiogram was done, the flulike symptoms, high white blood cell count, swelling, and fever, were indications that the infection was present.

Dr. Roberta Monson, a specialist in infectious diseases who examined Kirk during his hospitalization, agreed that Kirk's history of intermittent fevers, night sweats, the skin lesion, the aches and pains, and several episodes that suggested that emboli had broken off the infection and had gone to different parts of his body, were consistent with a diagnosis of endocarditis. When asked to state to a reasonable degree of medical certainty when the endocarditis began, Dr. Monson testified that based upon the medical history given to her by Kirk and his wife, Kirk had been sick for approximately three months.

■ On appeal, Kirk argues that ERISA violates the Seventh Amendment to the United States Constitution because it takes away the right to a trial by jury, and that the district court erred in determining that his condition was pre-existing as that term is defined in *Stamper*. Kirk agrees that the date of diagnosis is not the focus of the inquiry, but argues that his symptoms were not sufficient to allow a reasonably accurate diagnosis of endocarditis prior to the effective date of the policy, and therefore, the exclusion did not apply.

After de novo review of the evidence and the Arkansas law defining "pre-existing condition" we agree with the district court that benefits were properly excluded under the policy. As explained in *Lincoln Income Life Ins. Co. v. Milton*, 242 Ark. 124, 412 S.W.2d 291 (1967), the cases in which the insured's right to protection under *Stamper* have been upheld have been cases in which "the insured had some supposedly trivial infirmity or abnormality when the policy took effect. Later on, however, the condition changed for the worse and for the first time either actually became, or became diagnosable as, a sickness or disease falling within the coverage of the policy." *Id.* at 126, 412 S.W.2d at 292. *See also American Ins. Co. of Tex. v. Neal*, 234 Ark. 784, 786, 354 S.W.2d 741, 743 (1962) (*Stamper* case in line with weight of authority that "condition should be deemed to have had its inception *either* at the time it became active, *or* when sufficient evidence existed to allow a reasonably accurate diagnosis" where the germ or physical condition might have been present in the body prior to excluded time, but latent, inactive, or undiscovered) (emphasis added).

■ The doctors who examined Kirk were in agreement that the symptoms for which Kirk sought treatment in March 1988, stemmed from bacterial endocarditis; that is, the disease first manifested itself, or became active, in March. Under *Stamper,* therefore, Kirk's condition was pre-existing. We also conclude that Kirk's seventh amendment argument is without merit. *See In re Vorpahl*, 695 F.2d 318, 322 (8th Cir.1982).

Accordingly, the judgment of the district court is affirmed.

BRIGHT, Senior Circuit Judge, dissenting.

I respectfully dissent. As the saying goes, "Ask the wrong question and you will get the wrong answer."

Contrary to Provident's assertion, the question presented is not "when did the illness begin?" Rather, the question to be answered is "when [did] sufficient symptoms exist[ ] to allow a reasonably accurate diagnosis of the case[?]" *State Nat'l Life Ins. Co. v. Stamper*, 228 Ark. 1128, 312 S.W.2d 441, 442 (1958). Presented with the proper question, the answer is obvious: symptoms sufficient to allow a reasonably accurate diagnosis did not exist until the time when the doctors actually diagnosed Kirk as having bacterial endocarditis, well after the inception of coverage.

In *Stamper*, the parties disputed coverage under a policy which became effective in July 1954. The insured had a small bony growth or knot on the back of her head for most of her life which had caused no ill effects. In August of 1955, approximately a year after coverage began, however, the insured began to suffer pain in the neck and shoulders due to an increase in the size of the bony growth and sought medical attention. The question presented was whether the cause of the insured's sickness originated prior to thirty days following the effective date of coverage. *Stamper*, 312 S.W.2d at 442. If so, the policy excluded coverage.

The trial court found for the insured and the Arkansas Supreme Court affirmed. *Id.* After setting forth the standard quoted by the majority, *see supra* p. 505, the court concluded that: "it appears conclusive that [the insured] did not have any condition causing disability which manifested itself within thirty days from the effective date of the policy." *Stamper*, 312 S.W.2d at 442. Thus, although the bony growth existed prior to coverage, it did not qualify as a pre-existing condition because it did not manifest itself as a problem until after coverage began.

In contrast, the Arkansas Supreme Court has affirmed the denial of coverage where the symptoms did not increase after coverage began. *See Lincoln Income Life Ins. Co. v. Milton*, 242 Ark. 124, 412 S.W.2d 291 (1967). In *Milton*, the insured purchased her policy in July 1965. At that time, the insured's unknown condition of an abnormal and underactive thyroid made her "feel bad" and had interfered with her menstrual cycle for over a year. Later, in November 1965, the insured sought hospitalization and was diagnosed as suffering from a thyroid deficiency.

The insurance company denied coverage and the Arkansas Supreme Court upheld its actions. *Id.* 412 S.W.2d at 292. According to the court, the company properly denied the claim where there was "no indication that [the insured's] affliction *changed for the worse* between the issuance of the policy in July and her hospital confinement in November." *Id.* (emphasis added).

In reaching its conclusion, the *Milton* court distinguished *Stamper* and similar cases favoring the policyholder as follows:

In those cases, and in many others to the same effect, the insured had some supposedly trivial infirmity or abnormality when the policy took effect. Later on, however, the condition changed for the worse and for the first time either actually became, or became diagnosable as, a sickness or disease falling within the coverage of the policy. The insured's right to protection under the contract was properly upheld.

*Id.*

This case presents a record of an illness appearing to be relatively minor in scope, controlled and apparently healed by antibiotics. Kirk's more severe symptoms from his condition, as the insured's in *Stamper*, did not manifest themselves to Kirk or his doctors until June or July of the first policy year, a month or more after the inception date of the policy. Thus, the precondition fell within the language of *Stamper* as "latent, inactive, and ... not discovered" at the time or before the policy began. *Stamper*, 312 S.W.2d at 442.

The crucial factual findings made by the district court indicate that Dr. Henry Kirby, Kirk's treating physician, saw Kirk several times in March preceding the issuance of the policy, diagnosed the illness as an infection and prescribed antibiotics. The illness subsided during the next two months. No one has alleged that Dr. Kirby acted negligently or incompetently in failing to order an echocardiogram earlier.

This evidence establishes that sufficient symptoms did not exist prior to July 1988, to allow a reasonable diagnosis of bacterial endocarditis. Kirk's condition requiring hospitalization and surgery simply did not manifest itself as the problem until July 1988, when the symptoms warranted conducting an echocardiogram and such disclosed the precise illness.

The majority errs by relying on the 20/20 hindsight of the doctors who saw Kirk in July 1988. *See supra* p. 506 ("In Dr. Barlow's opinion, Kirk's medical history indicated that the infection had probably been present for about three months prior to surgery.... Dr. Monson testified that based upon the medical history given to her by Kirk and his wife, Kirk had been sick for approximately three months.") The issue turns on when a reasonable diagnosis could have been made, not when, with the benefit of subsequent testing, a doctor can ascertain the illness began. Certainly, with the incubation period of some diseases, a doctor could determine how long the disease has been present even though, at the date of onset, the disease was virtually undetectable.

Accordingly, I believe the record establishes that Kirk's infection did not manifest itself until after the policy was issued and thus I would reverse and award Kirk proper insurance benefits.