**Allen L. HARDESTER, Jr.; Barbara Hardester, Plaintiffs–Appellees,**

v.

**The LINCOLN NATIONAL LIFE INSURANCE COMPANY, administrator; Employers Health Insurance Company, Defendants–Appellants.**

No. 94–1172.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1994.

Decided Aug. 24, 1994.

Rehearing In Banc Granted; Opinion Vacated Oct. 13, 1994.

**ARGUED:** Bryan David Bolton, Shapiro & Olander, Baltimore, MD, for appellants. David Alan Titman, Ellicott City, MD, for appellees. **ON BRIEF:** Michael E. McCabe, Jr., Shapiro & Olander, Baltimore, MD, for appellants.

Before HALL and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Reversed and remanded with instructions by published opinion. Judge HAMILTON wrote the majority opinion, in which Senior Judge PHILLIPS joined. Judge HALL wrote a dissenting opinion.

**OPINION**

HAMILTON, Circuit Judge:

Defendants-appellants, Lincoln National Life Insurance Company (Lincoln National) and Employers Health Insurance Company (Employers Health) (collectively referred to as "the Defendants"), appeal the January 7, 1994 order of the district court granting the cross-motion for summary judgment of the plaintiffs-appellees, Barbara and Allen J. Hardester, Jr., on their action to collect insurance benefits and denying the Defendants' motion for summary judgment, 841 F.Supp. 714. For the reasons stated herein, we reverse and remand with instructions to enter judgment in favor of the Defendants.

## I

In August 1981, Barbara Hardester (Barbara) was diagnosed with fibrocystic disease.[1] Until April 1991, annual gynecological check-ups did not reveal the presence of any breast mass. On April 17, 1991, however, Dr. Barbara Phillips–Seitz (Dr. Phillips–Seitz) found "shoddy nodularity to the breast tissue," or small, palpable masses, in the "upper outer quadrants" of Barbara's breasts. (J.A. 67–68). Dr. Phillips–Seitz referred Barbara Hardester to a surgeon, Dr. Mary F. Boyle (Dr. Boyle), who, in May 1991, confirmed that, although Barbara had small masses in her breasts, they were consistent with fibrocystic breast disease.

On May 1, 1992, Barbara became eligible for benefits under a group health insurance plan (the Plan) issued by the Defendants to the employer of her husband, Allen L. Hardester, Jr. (Allen)[2]. The Plan excluded coverage for pre-existing conditions for which medical attention was received during the twenty-four months prior to May 1, 1992. Under the Plan, a pre-existing condition was defined as:

> a Sickness or Bodily Injury for which You have received medical attention (care, treatment, services, medication, diagnosis or consultation) prior to:
>
> 1. The effective date of Your medical ... coverage under this Policy[.]

(J.A. 52). The Plan defined a sickness as: (1) "a disturbance in function or structure of Your body"; (2) "which causes physical signs and/or symptoms and"; (3) "which, if left untreated, will result in a deterioration of the health state of the structure or system(s) of Your body." *Id.*

On April 6, 1992, during Barbara's annual gynecological examination, twenty-four days before the Plan's effective date, Dr. Phillips–Seitz discovered an "elongated ropey mass on the left [breast] at one o'clock." (J.A. 68–69, 74). Although Dr. Phillips–Seitz thought the newly discovered breast mass probably was benign, she was more concerned about

the possibility of cancer than she had been in April 1991 because of the marked fibrocystic change in the left breast. Accordingly, Dr. Phillips–Seitz referred Barbara to Dr. Boyle for a follow-up examination of the mass which, although presumably benign at that time, was later determined to be cancerous.

On May 1, 1992, Dr. Boyle again examined Barbara and noted the presence of the left breast mass. The mass, in the same location as the mass identified by Dr. Phillips–Seitz on April 6, 1992, was "ovoid" in shape, with a size of two centimeters by one centimeter. (J.A. 86). Initially, Dr. Boyle thought the mass was "probably" caused by fibrocystic disease. Dr. Boyle, however, admitted that when she felt the mass, she did not know whether she was feeling the fibrocystic condition or the cancerous tumor itself. Dr. Boyle recommended that Barbara have a mammogram, the results of which were negative. On May 13, 1992, Dr. Boyle again examined Barbara. Because the examination revealed no change in the condition of the breast mass, Dr. Boyle recommended a biopsy of the left breast mass. On May 28, 1992, the pathology report of the biopsy established that the mass was cancerous. Completely contained within the fibrocystic mass, the cancer itself constituted approximately one-third of the mass.

On June 15, 1992, Dr. Boyle surgically removed Barbara's left breast mass. If the cancerous mass had not been removed, it is likely that Barbara would have died from breast cancer, in the absence of intervening causes.

Barbara filed a claim for benefits under the Plan for the care and treatment she received for breast cancer. The Defendants refused to pay benefits for the treatment of the cancerous breast mass on the stated ground that it was a pre-existing condition based on "the medical records from Dr. Phillips–Seitz dated April 6, 1992," (J.A. 101), which reflected that Barbara received treat-

---

1. This disease is a benign condition of the breast marked by fibrous tissue and cyst formation. In some cases, fibrocystic disease may result in the formation of a firm area in the breast called a mass.

2. The plaintiffs-appellees are collectively referred to as "the Hardesters."

ment for the breast mass later determined to be cancerous.

On June 9, 1993, the Hardesters filed suit against the Defendants in the United States District Court for the District of Maryland.[3] The Hardesters alleged that the denial of benefits violated ERISA, 29 U.S.C. § 1132(a)(1)(B).[4]

After discovery, on October 13, 1993, the Defendants filed a motion for summary judgment. On October 26, 1993, the Hardesters filed a cross-motion for summary judgment and an opposition to the Defendants' motion. Granting the Hardesters' motion and denying the Defendants' motion, the district court reasoned:

> It is fair to say that prior to May 1, 1992, plaintiff had received medical attention for her fibrocystic disease. However, fibrocystic disease is not a "sickness" within the meaning of the policy since it would not in and of itself, if left untreated, have resulted in any deterioration of plaintiff's health. Conversely, while it may be assumed that plaintiff did have breast cancer prior to May 1, 1992—which certainly would be a "sickness" within the meaning of the policy—plaintiff had not received any "medical attention" for it. The cancer had not been diagnosed prior to May 1, 1992, and the care, treatment, service and consultation that plaintiff had received had only been for the fibrocystic disease.

(J.A. 156). The district court proceeded to hold that the simultaneous occurrence of the fibrocystic disease and the cancerous mass was coincidental. Accordingly, the district court concluded, "It would, at the least, distort th[e] purpose [of a pre-existing condition exclusion] to hold that a beneficiary has a 'pre-existing condition' within the meaning of the clause if she does not know or have

reason to know of the existence of the condition." (J.A. 157).[5] Therefore, on January 7, 1994, the district court issued a memorandum and order denying the Defendant's motion for summary judgment, granting the Hardesters' cross-motion for summary judgment, and entering judgment as a matter of law in favor of the Hardesters. This appeal followed.

## II

The standard of appellate review for the granting or denial of a summary judgment motion is *de novo*. Thus, the court of appeals uses the same standard as the district court. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14. The plaintiff is entitled to have the credibility of all her evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show ab-

---

**3.** The Hardesters first appealed the denial within the claims appeal process provided by the Defendants, but the companies continued to deny the claim.

**4.** 29 U.S.C. § 1132(a)(1)(B) provides that: "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

**5.** Dr. Boyle sent a letter to Lincoln National advising it that the "routine preventive health maintenance checkup by her [Mrs. Hardester's] gynecologist in April 1992" was not medical attention for a sickness as defined in their policy. The letter said that the consultation referral was for a fibrocystic condition and "could hardly be construed as treatment for carcinoma of the breast." (J.A. 145–46).

sence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; it may not rest upon mere allegations or denials. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

■ Likewise, court actions challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B) are subject to the standard of review announced in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Pursuant to that standard, the district court in the instant case reviewed the denial of benefits *de novo*. (J.A. 154–55 & n. 2). We also review the denial of benefits *de novo*. *See Firestone*, 489 U.S. at 115, 109 S.Ct. at 956; *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1021 (4th Cir.1993) (en banc).

### III

■ This case is governed by ERISA, which requires us to apply federal common law rules of contract interpretation when interpreting the terms of an employee health insurance policy. *Hammond v. Fidelity and Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992). *See Thompson v. Talquin Bldg. Products Co.*, 928 F.2d 649 (4th Cir.1991). In interpreting an ERISA plan, a court should "view the language of the insurance policy to determine where the parties' minds met." *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 432 (7th Cir.1994). Therefore, we must give effect to the words which denote the bargain, "not in light of public policy considerations, but in light of their plain meaning." *Id.* We have held that "[c]ourts are not at liberty to disregard the plain language of a plan in order to demand that insurers provide coverage...." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 57 (4th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993). In the absence of any ambiguity, our inquiry is limited to the terms and conditions set forth in the written Plan. *Id.* at 56. *See International Union of Electronic, Elec.,*

*Salaried, Mach. and Furniture Workers, AFL–CIO v. Murata Erie North America, Inc.*, 980 F.2d 889, 907 (3d Cir.1992).

■ Applying the above guidelines, we must determine whether the undiagnosed breast cancer constituted a: (1) sickness within the meaning of the Plan (2) for which Barbara had received medical attention such that the pre-existing condition exclusion under the Plan prevented her from collecting insurance benefits.

Examination of the plain language of the policy reveals that the pre-existing condition exclusion works to deny coverage in the instant case. Barbara's breast cancer falls within the Plan's specific definition of a sickness for which she received medical attention.

■ The Plan defined "sickness" as (1) "a disturbance in function or structure of Your body"; (2) "which causes physical signs and/or symptoms and"; (3) "which, if left untreated, will result in a deterioration of the health state of the structure or system(s) of Your body." (J.A. 52). With regard to the first element of "sickness," although the Plan does not define the term "disturbance", an ERISA plan must be interpreted according to the understanding of a reasonable layperson. *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1052–53 (7th Cir.1991). *See Hammond*, 965 F.2d 428 ("we interpret the terms of the policy 'in an ordinary and popular sense as would a [person] of average intelligence and experience.'") (citations omitted). The ordinary meaning of "disturbance" is an "alteration." *Webster's Third New Int'l Dictionary* (1981). A breast mass certainly constitutes an alteration of the "structure of the body." Moreover, we believe that a person of average intelligence would understand a breast mass to constitute a disturbance in body structure. Therefore, the first requirement under the definition of sickness has been fulfilled.

On April 6, 1992, the breast mass could be felt; therefore, it exhibited a clear "physical sign"—the second requirement for a "sick-

ness."[6]  The Hardesters argue that the fibrocystic breast disease caused the "sign" or "symptom" and not the cancer.  We cannot accept that argument.  Although the fibrocystic disease may well have caused the largest part of the mass, a portion of the lump contained within the mass was later determined to be cancerous.  Further, it does not appear that the fibrocystic disease and the cancerous mass were as "coincidental" and "separable" as the district court stated.  In fact, Dr. Boyle, in her deposition, admitted that when she was feeling the mass, she was not sure whether she was touching the fibrocystic condition or the cancerous lump itself.

Finally, we address the third element of a "sickness."  A portion of the mass was discovered to be cancerous.  If left untreated, the mass would have caused a "deterioration" in the "state" of Barbara Hardester's health: as Dr. Phillips–Seitz testified, she would have died.

Next, we turn to whether, within the twenty-four months prior to May 1, 1992, Barbara received "medical attention" for her breast mass which was later diagnosed as cancerous.  The Plan defines medical attention as any one of the following: (1) care; (2) treatment; (3) services; (4) medication; (5) diagnosis; or (6) consultation.  In the instant case, Barbara received "care," "treatment," "services," or "consultation" for or relating to the breast mass which a later biopsy revealed to have been malignant: Dr. Phillips–Seitz discovered the breast mass on April 6, 1992 and noted it in her medical record.  Although she still believed the mass was merely fibrocystic in nature, the marked fibrocystic change in the left breast had heightened Dr. Phillips–Seitz's concern over the possibility of cancer.  As a precaution, she referred Barbara to Dr. Boyle, who performed the biopsy.[7]  The results of the biopsy established that the lump previously thought to be benign was actually a cancer-

ous mass contained within the fibrocystic mass.  Because the lump was cancerous on May 28, 1992, we may infer that the lump was cancerous on April 6, 1992.  In fact, the district court held that "it may be assumed that plaintiff [Barbara] did have breast cancer prior to May 1, 1992."  (J.A. 156).  Therefore, although Barbara was unaware that "the lump was cancerous in April, her visit with the doctor in that month concerning the lump actually concerned cancer." *Bullwinkel,* 18 F.3d at 432.  It follows that Barbara received "care," "treatment," "services," and "consultation" in April for her cancer.

We find further support for our conclusion in the decisions of two other circuits which have considered the specific issue presented by the instant case.  In *Bullwinkel,* the Seventh Circuit held that a preexisting condition exclusion applies to an undiagnosed illness.  The facts of that case are substantially similar to the facts in the case at hand.  In *Bullwinkel,* Mrs. Bullwinkel had detected a lump in her left breast.  18 F.3d at 429–30.  She saw her physician on July 20, 1991, and he performed an ultrasound examination of the lump.  The physician diagnosed the lump as a cyst and assured her that the cyst was probably benign.  Because he was concerned about the possibility of cancer, however, Mrs. Bullwinkel's physician referred her to a surgeon for removal and biopsy of the cyst. *Id.*

The New England Mutual Policy became effective on July 31, 1991.  Mrs. Bullwinkel had her first visit to the surgeon on August 15; the surgeon removed the lump on September 6, 1991.  Tests on the removed lump revealed that it was cancerous. *Id.*

Mrs. Bullwinkel sought coverage from New England Mutual for her initial surgery and subsequent cancer treatment.  New England Mutual denied coverage based on the pre-existing condition exclusion.[8]  Both

**6.**  It is also apparent that the Plan's definition of a "sickness" did not require that the breast cancer be accurately diagnosed before the effective date.

**7.**  The Defendants point out that the original diagnosis of the breast mass, although erroneous, was medical attention *per se.*

**8.**  The pre-existing condition exclusion, nearly identical to the exclusion in the instant Plan, provided in pertinent part as follows: "No benefits are payable for a condition, sickness, or injury for which you or your dependent were seen, treated, diagnosed, or incurred medical expense in the six-month period just before insurance starts...." *Id.* at 431.

the district court and the Seventh Circuit affirmed the denial of benefits. The Seventh Circuit explained its decision:

> True, Madeline was never "seen, treated, [or] diagnosed" specifically for breast cancer in July, nor did she incur medical expenses specifically for breast cancer in July. But she was "seen, treated, [and] diagnosed" and she did incur medical expenses for a breast lump in July. The lump was discovered in September to be cancerous. We may infer from this fact that the lump was also cancerous in July. So, even though Madeline did not know the lump was cancerous in July, her visit with the doctor in that month concerning the lump actually concerned cancer. It follows that Madeline was "seen" and "treated" and incurred medical expenses for her cancer in July. Therefore, any post-policy treatment concerning the same condition is not covered.

*Id.* at 432.[9]

In light of the principles set forth in the above cases, we agree with the positions taken by the Seventh and Eighth Circuits and find that the pre-existing condition exclusion in the instant case precludes any recovery for medical expenses regarding Barbara's breast cancer. First, as the decisions above indicate, simply because Barbara's cancer was not yet diagnosed at the Plan's effective date does not mean that she did not have a pre-existing condition: Barbara received "medical attention" [as defined in the Plan] for a sickness within the meaning of the Plan. For example, Barbara, like the plaintiff in *Bullwinkel*, saw her physician shortly before the Plan's effective date. Her physician found a breast mass. Dr. Phillips–Seitz, like Mrs. Bullwinkel's physician, was concerned about the possibility that the mass might be cancerous and referred her to a surgeon as a precaution. As a result of the referral, a biopsy was performed, and, like Mrs. Bullwinkel, Barbara's breast mass was determined to be cancerous. We conclude that, as in Mrs. Bullwinkel's case, Barbara received medical attention for her cancer before the Plan's effective date.

The Hardesters contend that the pre-existing condition exclusion does not prevent coverage of the breast cancer. We disagree. The Hardesters argue, that, as the district court noted, not requiring specific knowledge of the illness would allow insurers to avoid coverage "when the victim is blissfully unaware of the medical 'seeds' visited upon his body." (J.A. 157) (quoting *Mutual Hosp. Ins., Inc. v. Klapper*, 153 Ind.App. 555, 288 N.E.2d 279, 282 (1972) (reversing summary judgment entered in favor of the insured in a non-ERISA case)).[10] While we acknowledge that this argument is emotionally appealing, we are constrained to reject it. As the Seventh Circuit stated in *Bullwinkel*, interpretation of an insurance contract requires that we look to the language of the insurance contract—not public policy:

> The Bullwinkels commit a large portion of their brief to making public policy arguments favoring their position. But we are restricted by federal common law rules of contract interpretation to view the language of the insurance policy to determine where the parties' minds met. Therefore, we must give effect to the words which denote the bargain, not in light of public policy considerations, but in light of their plain meaning.

**9.** The Eighth Circuit also adheres to the view expressed in *Bullwinkel*. In *Kirk v. Provident Life & Acc. Ins. Co.*, 942 F.2d 504 (8th Cir.1991), Kirk was treated for a number of symptoms which led his physician to suspect he had a congenital heart disease. A blood test that should have detected the disease, however, proved negative. *Id.* at 505–06. Kirk then became a member of an ERISA health care benefit plan that excluded pre-existing conditions. When Kirk later displayed symptoms of congenital heart disease, a heart specialist diagnosed his condition as a heart illness. *Id.* at 506. The Eighth Circuit found Kirk's illness was not covered because his illness predated the policy. The *Kirk* court was unpersuaded by the fact that the illness was not diagnosed until after the policy became effective. *Id.*

**10.** We note that the *Klapper* case is a pre-ERISA case based on Indiana state law which is factually distinguishable from the instant case. In *Klapper*, the medical attention occurred after the effective date of the policy, and the *Klapper* court merely considered the question of when an illness "exists." That case is simply not analogous to the instant case.

*Bullwinkel,* 18 F.3d at 431. The plain language of the policy at issue indicates that Barbara's breast cancer was a pre-existing condition excluded from coverage under the Plan.

## IV

In summary, we find that the district court erred in denying the Defendants' motion for summary judgment and in granting the Hardesters' cross-motion for summary judgment. Accordingly, for the reasons stated herein, the judgment of the district court is reversed and the case is remanded with instructions to enter judgment for the Defendants.[11]

*REVERSED AND REMANDED WITH INSTRUCTIONS.*

K.K. HALL, Circuit Judge, dissenting:

According to Dr. Phillips–Seitz, "we were lucky to have found this elongated ropey mass ... because otherwise we wouldn't have noticed the cancer." Today the majority turns Mrs. Hardester's luck into the insurance companies'. There are times when the law compels such an unjust result, but not this time. I dissent.

### I.

Plaintiff Barbara Hardester was diagnosed with fibrocystic breast disease in 1982. This "disease" is wholly benign, and is common in women in their thirties and forties. A woman suffering from fibrocystic disease will develop cysts, masses, and other accumulations of fibrous tissue in her breasts. Fibrocystic disease *is not* cancer, and *does not develop* into cancer; indeed, it does no damage to the woman's physical health at all.

On April 6, 1992, Mrs. Hardester had her annual gynecological examination. Her gynecologist, Dr. Phillips–Seitz, noted fibrocystic changes from the previous year in both breasts and an "elongated ropey mass" in the left breast. As she always did when she noted any new manifestation of the fibrocystic disease—indeed, as she had the previous year—Dr. Phillips–Seitz referred Mrs. Hardester to a surgeon, Dr. Boyle, for follow-up.[1]

Dr. Boyle saw Mrs. Hardester on May 1, the day she first became insured under the policy. Dr. Boyle diagnosed fibrocystic disease as well. In addition, because of the fibrocystic changes and because it had been more than a year since Mrs. Hardester's last mammogram, Dr. Boyle ordered a mammogram. The mammogram, performed May 7, was negative.

Mrs. Hardester returned to Dr. Boyle on May 15 as a follow-up to the mammogram. Because mammograms are less accurate for women with dense fibrous breast tissue, Dr. Boyle recommended a biopsy of the mass in the left breast. The "elongated ropey mass" was removed on May 26, and the results of a biopsy were returned on June 3. Most of the mass was fibrocystic tissue; however, it contained a small (9 mm across) malignant carcinoma. That the fibrocystic "ropey mass" happened to encase the unrelated cancer had saved Mrs. Hardester's life. Dr. Phillips–Seitz explained, "we were lucky to have found this elongated ropey mass ... because otherwise we wouldn't have noticed the cancer. If she had simply had this tiny cancer in her breast, we wouldn't have felt it." Dr. Boyle likewise described the cancer as merely "coincident" with the fibrocystic disease, with no causal connection.

Though the carcinoma itself was removed before it was even discovered, Mrs. Hardester had to undergo chemotherapy to prevent recurrence of breast cancer. Lincoln National and Employers Health have refused to pay for this vital treatment because they assert that the cancer was a "preexisting condition" under the policy. After she exhausted the companies' internal remedies, Mrs. Hardester, along with her husband (the

---

11. We hereby grant the Hardesters' motion to strike the Addendum of Secondary Authority appended to the Defendants' brief as well as any reference to the addendum and similar authority contained within the brief.

1. At her deposition, Dr. Phillips–Seitz testified that she refers "anybody with a fibrocystic condi-

tion" to a surgeon, but that those referrals uncovered latent breast cancer less than five percent, "maybe one percent" of the time. Where Dr. Phillips–Seitz actually *suspects* cancer, she refers her patient to a surgeon within a day, rather than the several weeks for an ordinary referral.

named insured), filed this suit in district court. The district court conducted a de novo review of the record, found that Mrs. Hardester's breast cancer was not a "preexisting condition," and ordered the insurance companies to pay. *Hardester v. Lincoln National Life Insurance Co.*, 841 F.Supp. 714 (D.Md.1994).

The insurance companies appeal.

## II.

Review here, as in the district court, is de novo. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). In interpreting the policy, we apply ordinary principles of contract law. *Glocker v. W. R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir.1992). These principles require us to enforce the policy's plain language in its ordinary sense and to construe ambiguous terms against the drafter if they are not clarified by extrinsic evidence of the parties' intent. *Id.*

For the first year following the effective date of coverage, the insurance policy at issue does not cover a "preexisting condition":

> a Sickness or Bodily injury for which You have received medical attention (care, treatment, services, medication, diagnosis or consultation) prior to [the effective date].

A "Sickness" is

> a disturbance in the function or structure of Your body which causes physical signs and/or symptoms and which, if left untreated, will result in a deterioration of the health state of the structure or system(s) of Your body.

I agree with the district court that Mrs. Hardester's breast cancer was not a "preexisting condition" under these clauses. The medical record shows that Mrs. Hardester went for a *routine* annual gynecological exam and received a *routine* referral to a surgeon for followup on the new manifestations of her fibrocystic disease. She received absolutely no "care, treatment, services, medication, diagnosis or consultation" for the tiny carcinoma in her breast before the effective date of the policy.

Lacking evidence, the insurance companies resort to distortion of the record and of the district court's opinion. Their most pervasive gimmick is to absolutely ignore a fact undisputed in this record—the large ropey fibrocystic mass and the small carcinoma were merely, and luckily, *coincident.* From the very beginning of their brief's "Statement of the Case," the insurance companies refer to "the mass" as if a single condition were involved.[2] Through this distortion, the companies are then able to make arguments that "the mass" had "caused physical signs or symptoms" and had received "medical attention" before the effective date of the policy. The companies have convinced the majority to look at the case this way,[3] but they have not convinced me.

Most of "the mass" was just what Dr. Phillips–Seitz thought it was—benign fibrous tissue. The tumor, on the other hand, would not have been palpable to Dr. Phillips–Seitz[4] but for the "lucky" happenstance that it was encased in unrelated benign tissue. The tumor *had not* caused any noticeable physical change or symptom in Mrs. Hardester before the effective date of the policy, and it had not received any medical attention.

The best way to illustrate is to hypothesize a woman precisely like Mrs. Hardester *except* that she did not suffer from fibrocystic disease. On April 6, she would have had a routine, normal breast exam; because the

---

**2.** *E.g.,* under "Nature of the Case," the companies assert:

> The gynecologist erroneously believed the mass was benign. One month after the effective date, the breast mass was conclusively diagnosed as cancerous.

**3.** See *supra* at 334–35, where the majority applies the policy's preexisting condition test to "the mass" rather than to the cancer.

**4.** The majority cites *Dr. Boyle's* deposition testimony (*supra* at 356) in an attempt to show that, perhaps, the carcinoma itself was palpable. I see no relevance in what Dr. Boyle felt or did not feel after the effective date of the policy. Dr. Phillips–Seitz stated that she could not have felt the tiny cancer on April 6, which is the only possible date the cancer could have received "medical attention" before the policy went into effect.

tumor was too small to be felt, she would not have been referred to Dr. Boyle for follow-up, and may not have had a mammogram or biopsy for several months or years. When she was finally diagnosed with cancer, could the insurance companies assert that she had received "medical attention" for her cancer on April 6? Of course not. Why, then, should the result be any different just because Mrs. Hardester had a benign, unrelated condition that was treated on April 6 and that, through sheer luck, led to the timely discovery of her cancer? The answer is simple: it should not make any difference.

I reiterate: *according to the undisputed medical record, there was no causal or associative relationship between the fibrocystic tissue and the carcinoma.* What if Dr. Boyle's follow-up had uncovered cancer in Mrs. Hardester's other breast, and nothing but fibrocystic tissue in the "elongated ropey mass?" Could the insurance companies assert that she had received "medical attention" for cancer on April 6? I would hope that all persons of good will would answer, "Of course not." [5] Why, then, should the result be any different just because Mrs. Hardester had a benign, unrelated condition that was treated on April 6 and that, through sheer luck, led to the timely discovery of her cancer? The answer is simple: it should not make any difference.

The companies' best case is *Bullwinkel v. New England Mutual Life Insurance Co.*, 18 F.3d 429 (7th Cir.1994). *Bullwinkel* involved, as the companies wish this case did, a single, suspicious "lump," discovered just before the effective date of the policy. The doctor felt *at the time* that "the lump" was more likely than not benign, but he was concerned about "the possibility" of cancer. The lump was later removed and was found to be malignant. The Seventh Circuit held that the cancer was preexisting, and that the lack of a definite diagnosis was irrelevant.

I am not sure that I agree with *Bullwinkel,* but I can say that it is easily distinguishable from this case. Here, the cancer was discovered *in the course of treating an unrelated manifest condition,* while in *Bullwinkel* the only issue was whether the manifest condition was or was not malignant. In other words, the cancerous lump was discovered before the effective date in *Bullwinkel;* here, the cancerous lump was discovered *after* the effective date.[6]

Finally, the companies assert that Judge Motz "held" that applying a preexisting condition clause to an undiagnosed condition would violate public policy. He did no such thing. He held that Mrs. Hardester's cancer was not preexisting under the clause at issue, and, because "the case can be decided on its own narrow facts[,] I need not decide the broader question which it poses." Judge Motz then went on to question whether public policy would permit the enforcement of a preexisting condition clause, like the one here, that wholly dispenses with a requirement that the patient know (or have reason to know) of his condition on the effective date of the policy. He quoted an Illinois case: " 'to consider a disease to exist at a time when the victim is blissfully unaware of the medical "seeds" visited upon his body, is to set a trap for the unwary purchaser of health insurance policies.' " 841 F.Supp. at 716

---

5. Nonetheless, the logical extension of the insurance companies' argument here would call for a contrary answer. According to their brief, any referral for testing motivated by a desire to rule out breast cancer is "medical attention" for cancer under the Plan. This argument badly distorts the manner in which preventive care is administered to women in this country. *Every* woman must be concerned about and take precautions against breast cancer. Physicians like Drs. Phillips–Seitz and Boyle order mammograms and other diagnostic tests routinely, not because the risk to any single woman is very great, but because the risk is there in every woman, and the consequence of not taking routine precautions is so dire. A doctor who ignores a one percent risk of death present in all of her patients can be assured that several will die every year. On the other hand, the dead patients' insurance companies would not have any "precautions" to point to as evidence of a "preexisting" condition. Excuse me for using the law's most hackneyed literary allusion, but a medical insurance system that covers only well persons and those sick persons who have not vigilantly monitored their health makes sense only if viewed through the looking glass.

6. My comment on *Kirk v. Provident Life and Accident Insurance Co.,* 942 F.2d 504 (8th Cir. 1991), is simply that I agree with Senior Judge Bright's dissent in that case. *Id.* at 506–508.

(quoting *Mutual Hospital Ins., Inc. v. Klapper*, 153 Ind.App. 555, 288 N.E.2d 279, 282 (1972)). I share the concerns of Judge Motz, but, just as he resolved the case in Mrs. Hardester's favor on the terms of the clause, so also would I.

I respectfully dissent.