99 F.3d 1145
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Bernard HALL, Plaintiff-Appellee,
v.
WAL-MART ASSOCIATES GROUP HEALTH PLAN CORPORATIONS, Does I
through X, and Roe Corporations I through X,
inclusive, Defendant-Appellant.
 No. 95-15587.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Aug. 21, 1996.
 
 Before: WOOD, Jr.* , CANBY, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 The Administrative Committee of the Wal-Mart Associates Group Health Plan denied coverage to Bernard Hall for treatment of his prostate cancer. Based on its interpretation of the language of the plan's preexisting conditions clause in conjunction with Hall's recent medical history, it deemed his "prostate problems" to be preexisting, thus precluding coverage.
 
 
 3
 The district court, however, found that this decision by the Administrative Committee was an abuse of discretion and granted Hall's motion for summary judgment. The court awarded Hall the amount of the denied benefits as well as attorney's fees. The Wal-Mart Plan appeals both of the court's decisions as well as the court's denial of its competing motion for summary judgment.
 
 I. FACTUAL BACKGROUND
 
 4
 At sixty-two years of age, Bernard Hall ("Hall") began employment as an Associate at Wal-Mart Stores, Inc. and obtained insurance under the Wal-Mart Associates Group Health Plan ("Plan"). The Plan, governed by ERISA, was established by the company's Health and Welfare Trust and is self-funded by Wal-Mart and by employee contributions.
 
 
 5
 Hall became eligible for benefits under the Plan on August 14, 1992, subject to the Plan's limitations. As with many health plans, a significant limitation is one that precludes coverage for preexisting conditions. The plan's documentation defines a preexisting condition as follows:
 
 
 6
 Any charge with respect to any Participant for any illness, injury or symptom (including secondary conditions and complications) which was medically documented as existing, or for which medical treatment, medical service, or other medical expense was incurred within 12 months preceding the Effective Date of these benefits as to that Participant, shall be considered pre-existing and shall not be eligible for benefits under this Plan, until the Participant has been continuously covered by the Plan 12 consecutive months.
 
 
 7
 The plan gives initial review of a benefits denial to an Administrative Committee which "has been expressly given, by the Plan, discretionary authority to resolve all questions concerning the administration, interpretation or application of the plan." The Administrative Committee has available to it a Medical Advisory Board comprised of "medical practitioners" for consultation on matters that require medical expertise.
 
 
 8
 The History of Hall's "Prostate Problems"
 
 
 9
 It is necessary to recount Hall's physical condition in some detail as it was found to be for the years in question. In July, 1991 (just prior to the "preexisting" period), Hall was given a Prostatic Specific Antigen (PSA) test by his physician, Dr. Petruso. This test is a blood analysis which aids in the detection of prostate cancer. Hall's test showed a PSA level of 8.3, considered to be a little higher than average and suggesting the possibility of prostatic disease.[1] Dr. Petruso referred Hall to urologist Dr. Sheldon Freedman. After his initial examination of Hall on August 6, 1991, Dr. Freedman recorded findings of an enlarged prostate and Hall's "symptoms of urinary post-void dribbling, urinary hesitancy, and a sensation of incomplete bladder emptying." Dr. Freedman then performed a transrectal ultrasound on August 30, 1991 (a date within the "preexisting" period). Using the ultrasound technology, Freedman also obtained biopsies from suspicious areas of Hall's prostate. Dr. C.H. Parks, a cytopathologist, examined the biopsies and on September 5, 1991 diagnosed Hall as having "mild chronic prostatitis with reactive epithelial changes." Dr. Freedman concluded that cancer was not likely, but he ordered follow-up testing for Hall in about six months. The test was scheduled for March 1992. Hall missed that March follow-up appointment, and also the rescheduled appointment on August 10, 1992, which was just a few days before his Plan coverage was to begin.
 
 
 10
 When Hall did keep his appointment on September 25, 1992, his PSA count was determined by Dr. Lane Friedman to have risen to 10.8.[2] A few days later, on September 28, 1992 (after coverage had begun), Hall returned to Dr. Freedman. Dr. Freedman performed another ultrasound and biopsy, and diagnosed benign prostatic hyperplasia (enlargement). A new biopsy was done and analyzed by a pathologist on October 21, 1992. That biopsy resulted in a finding of "well to moderately differential adenocarcinoma," or cancer of the prostate. Hall was referred to urologist Dr. Scott A. Slavis for evaluation and treatment. Dr. Slavis diagnosed Hall as having "probably localized carcinoma of the prostate."
 
 
 11
 In January, 1993, Dr. Slavis performed a bilateral pelvic lymphadenectomy and radical recto-pubic prostatectomy which denotes the surgical removal of the entire prostate and related lymph glands. A pathological analysis of the tissues removed from Hall confirmed the diagnosis of prostate cancer.
 
 The Denial of Benefits
 
 12
 The Wal-Mart Plan refused to pay for Hall's medical expenses incurred in the diagnosis and treatment of his prostate cancer because it deemed this condition to be preexisting. The initial letter denying benefits, dated January 22, 1993, reprints the preexisting conditions definition with the word "symptom" highlighted. The letter then goes on to say: "Your effective date of coverage is August 14, 1992. The Plan has denied charges for prostate problems as preexisting. Medical documentation from Dr. Sheldon Freedman indicate (sic) that you were seen on August 30, 1991 for this same problem." The district court summarized the letter as follows: "The Plan denied benefits asserting that, since he had been treated for 'prostate problems,' his prostate cancer was pre-existing."
 
 
 13
 Hall appealed the denial of benefits to the Administrative Committee. Following consideration of written opinions submitted by Hall's doctors and its own Medical Advisory Board, the Administrative Committee sent Hall a letter dated July 13, 1993, upholding the denial.
 
 
 14
 Hall filed a complaint against the Plan in state court on August 11, 1993. Because the plan is governed by ERISA, 29 U.S.C.A. § 1001 et seq. (West 1985 & Supp.1996), the action was removed to federal court. In the fall of 1994 competing motions for summary judgment were filed. Hall sought summary judgment on the basis that his first biopsy demonstrated that his prostate cancer was not a preexisting condition. The Plan relied on its coverage language and the interpretations given that language by the relevant administrative and fiduciary bodies. The district court carefully considered the factual circumstances and decided in favor of Hall as a matter of law. In its February 22, 1995 order the court found the Plan's decision to deny benefits to Hall to be an abuse of discretion and awarded him the value of the benefits that had been denied as well as attorney's fees.
 
 II. DISCUSSION
 
 15
 As we begin consideration of the issues we bear in mind that where the Plan gives the administrator discretionary authority to make eligibility determinations and to construe the Plan, the district court reviews the determination under an abuse of discretion standard, and the district court's determination is subject to de novo review by this court. Winters v. Costco Wholesale Corp., 49 F.3d 550, 552 (9th Cir.1995).
 
 
 16
 An ERISA plan abuses its discretion if it construes the provisions of the plan in a way that conflicts with the plain language of the plan. Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1472-73 (9th Cir.1994). The question is not whose interpretation of the preexisting conditions clause is more reasonable, but whether the Administrative Committee's interpretation is unreasonable. Winters, 49 F.3d at 553. Furthermore, we note that when a plan grants a fiduciary explicit discretion to interpret plan language, the rule of contra proferentem, or resolving ambiguities against the drafter, does not apply. Id. at 554.
 
 
 17
 Both parties agree as did the district court that the issue is whether or not Wal-Mart abused its discretion in denying Hall coverage under the Plan's preexisting conditions clause. We note initially that the discretion afforded the Administrative Committee's interpretation of Plan language is quite broad. The underlying Trust Agreement provides as follows:
 
 
 18
 The parties hereto specifically intend that the Administrative Committee have the greatest permissible discretion to construe the terms of the Health and Welfare Plans and to determine all questions concerning eligibility, participation and benefits. Any such decision made by the Administrative Committee shall be binding on the Company and all Participants and is intended to be subject to the most deferential standard of judicial review. Such standard of review is not to be affected by any real or alleged conflict of interest on the part of the Administrative Committee.
 
 
 19
 The Plan follows up the Trust Agreement's discretion provision in further providing as follows:
 
 
 20
 The Plan herein expressly gives the Administrative Committee discretionary authority to resolve all questions concerning the administration, interpretation or application of the Plan, including, without limitation, discretionary authority to determine eligibility for benefits or to construe the terms of the Plan in conducting review of the appeal.
 
 
 21
 The Administrative Committee referred to in the Trust document reviews any appeals from the denial of benefits with the administrator of the Plan and a Medical Advisory Board. The latter is a group of medical practitioners who assist the Administrative Committee when expert medical opinion is needed to rule on a claim.
 
 
 22
 The district court found that the Plan's denial of benefits to Hall because of his preexisting "prostate problems" contorted the preexisting condition clause beyond its plain and ordinary meaning. The plain language of the clause, the court found, only excluded charges for any preexisting illness, injury, or symptom, not for preexisting "problems" as the Plan's letter stated. The court pointed out that there is no language in the Plan which excludes charges because of preexisting "problems." The court also noted that Hall's first biopsy was negative for cancer. Further, it appeared the Plan's use of the phrase "prostate problems" in the letter was intended to include any illness, injuries, or symptoms of the prostate other than cancer. Therefore the court reasoned that the preexisting condition clause did not exclude benefits for one illness, prostate cancer, when a Plan participant was previously diagnosed only as having some other illness. The court concluded that the term "problems" was overly broad and vague and that its use to deny Hall benefits was an abuse of discretion.
 
 
 23
 We find that the result reached by the district court, though not without some justification, must be set aside in the particular circumstances of this case. The wording of the Plan's preexisting conditions clause, especially the use of the originally undefined term "symptom," might have been clearer but the interpretation adopted does not conflict with the Plan's plain language. Moreover, it is true that the Plan's letter to Hall denying benefits, especially its use of the phrase "prostate problems," does not precisely explain the full reasoning for the denial. However, we believe the Plan's reasoning was clear enough in the context of the letter and applicable medical history to advise Hall in general why coverage was being denied.
 
 
 24
 Hall already knew from his doctors the specific details of his physical condition without further need for more in the letter. The general reference to "prostate problems" spared the repetition of the intimate details of his prostate condition. His prostate "problems" were related, at the least in terms of the Administrative Committee's legitimate interpretation of the word "symptom," and foreshadowed his prostate cancer. Hall's prostate problems had concerned his doctors sufficiently for them to order further cancer tests. We do not see the letter's reference to "prostate problems" as being decisive of the coverage issue.
 
 
 25
 Bearing in mind that coverage began on August 14, 1992, it was only about a month and a half later (September 25, 1992) when it was determined that Hall's PSA had in the meantime risen over 2 points to 10.8. Had Hall kept his prior two appointments with his doctor earlier in 1992 (during the preexisting period) his rising PSA might have been detected. After the PSA rise was documented by Dr. Lane Friedman, Dr. Shelton Freedman prescribed another transrectal ultrasound and ultrasound-guided biopsy on October 20, 1992. The next day, October 21, a pathologist reported finding cancer in the tissue. That diagnosis came just a little over two months after coverage began. In early 1993 Hall was admitted to the hospital for what his brief describes as a "radical prostatectomy," or the surgical removal of his prostate gland. That the complete removal of the prostate was found to be necessary not long after coverage began suggests that, although not detected earlier, the cancer was not an overnight development.[3] The Committee did not abuse its discretion in connecting the cancer with the earlier, medically documented symptoms.
 
 
 26
 In addition to Hall's original elevated PSA, he had other conditions documented at that time by Dr. Friedman including an enlarged prostate and problems with urination. Those findings required additional cancer testing which Hall failed to submit to at the appointed times. His doctor's expressed opinion of "cancer unlikely" is not entitled to great weight as the subsequent diagnosis demonstrated that prediction to be wrong. That the earlier biopsy of suspicious prostate areas was negative is also entitled to only limited weight as the biopsy was only of certain suspicious areas selected by the doctor, not the whole prostate. Therefore, cancer in other parts of the prostate could not be ruled out. The mere fact that a diagnosis was missed or incorrectly made prior to coverage does not necessarily preclude a later exclusion on the basis of a preexisting conditions clause. See Kirk v. Provident Life and Accident Ins. Co., 942 F.2d 504 (8th Cir.1991) (holding that a disease can be preexisting even though its presence had been effectively ruled out prior to coverage); McCorkle v. Life Gen. Sec. Ins. Co., 830 F.Supp. 1446, 1449 (M.D.Fla.1993) (where the policy does not require a diagnosis but merely requires symptoms to be present, a diagnosis is not required); Fischman v. Blue Cross & Blue Shield of Conn., 775 F.Supp. 513, 516 (D.Conn.1991) (plain language of exclusion clause does not require accurate diagnosis when acute symptoms present).
 
 
 27
 This discussion leads us to the amount of discretion allowed by the Plan to the Administrative Committee, which we view as the controlling issue on these facts. The Committee has the "greatest permissible discretion to construe the terms of the" Plan and "to determine all questions concerning eligibility, participation and benefits." Its decision was specified to be binding on the companies and the parties and was intended to be subject to only the most "deferential standard of judicial review." The early examinations, the elevated PSA, and the other conditions were sufficient for Hall's doctors to continue testing to determine if cancer was developing, even while opining that cancer was "not likely." As was soon demonstrated, however, the "prostate problems," as the letter refers to them, were in fact indications of cancer of the prostate.
 
 
 28
 Hall argues that the latitude given by the Committee to the term "symptom" in the preexisting conditions clause would disqualify Hall for coverage for a myriad other diseases or illnesses unrelated to the prostate gland. The Plan answers this concern by noting that there must, of course, be some type of "clinical connection" between the symptoms at issue and the condition in question. It is unnecessary to reach the broad question as phrased by Hall in the circumstances of this case. Hall's prostate problems were symptoms of possible prostate cancer, which rightly concerned his own doctors. Each side offered the varying opinions of doctors before the Plan's fiduciary, the Administrative Committee. We believe there was sufficient evidence and inferences for the Committee to fairly and reasonably under the Plan deny benefits to Hall. That decision therefore cannot be held to have been an abuse of discretion.
 
 
 29
 We believe it is our obligation in these circumstances to review the Plan's determination deferentially. Considering the Committee's discretion given to construe the meaning of its plan as well as all questions of benefits we are compelled to reverse the judgment of the district court as a matter of law and to remand the case to the district court to enter judgment for the Plan. The issue of attorney's fees becomes moot. The parties shall bear their own costs in this appeal.
 
 
 30
 Reversed and remanded with directions.
 
 
 
 *
 The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, is sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 For a comprehensive discussion in layman's language of prostate cancer see Leon Jaroff, The Man's Cancer, Time, Apr. 1, 1996, at 58. Time reports that generally a PSA count of 4 indicates that cancer is unlikely, but the probability of cancer increases with a rising count between 4 and 22. If the count rises above 22, cancer is highly likely
 
 
 [2]
 In view of the similarity of the names involved, we note that Dr. Lane Friedman is to be distinguished from Dr. Sheldon Freedman
 
 
 [3]
 Time, id. at p. 62, likewise refers to this operation as "radical" in view of other possible treatments including radiation